**CITIZENS FEDERAL BANK, FSB, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 92–656 C.

United States Court of Federal Claims.

Feb. 20, 2002.

Charles J. Cooper, Washington, DC, for plaintiffs. David H. Thompson and Robert J. Cynkar, Washington, DC, of counsel.

Henry R. Felix, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant, with whom were Jeanne E. Davidson, Deputy Director; David M. Cohen, Director; and Stuart E. Schiffer, Acting Assistant Attorney General.

## OPINION

DAMICH, Judge.

This case is before the Court on the Plaintiffs' motion for partial summary judgment, the Defendant's cross-motion for summary judgment as to liability and the Court's Order to Show Cause in this *Winstar*-related case. At issue is whether the Defendant breached its contractual obligations to the Plaintiffs with respect to Citizens Federal Savings Bank's acquisition of Equitable Federal Savings and Loan Association of Lancaster, Ohio, in 1986 and American Savings Bank of Springfield, Illinois, in 1988. Oral argument is deemed unnecessary. For the reasons enumerated below, the Plaintiffs' motion for partial summary judgment is GRANTED, and the Defendant's cross-motion is DENIED.

## I. Facts

### A. Background

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA). Pub.L. No. 101–73, 103 Stat. 183, codified, in relevant part, at 12 U.S.C. § 1464. FIRREA "(1) abolished the Federal Savings and Loan Insurance Corporation (FSLIC) and transferred its functions to the other agencies; (2) created a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation (FDIC); (3) eliminated the Federal Home Loan Bank Board (FHLBB) and replaced it with the Office of Thrift Supervision (OTS), an office within the Department of Treasury, and made the OTS Director responsible for the regulation of all federally insured savings associations and the chartering of federal thrifts; [and] (4) established the Resolution Trust Corporation (RTC), which was charged with closing certain thrifts." *Winstar Corp. v. United States,* 64 F.3d 1531, 1538 (Fed.Cir.1995) (paraphrasing 12 U.S.C. §§ 1437, note 1441a, 1821). FIRREA required OTS to "prescribe and maintain uniformly applicable capital standards for savings associations." 12 U.S.C. § 1464(t)(I)(a). It also expressly restricted the continued use of supervisory goodwill to satisfy regulatory capital requirements. It

did so by establishing three new capital standards: core capital, tangible capital and risk-based capital. 12 U.S.C. § 1464(t). Pursuant to these standards, supervisory goodwill could not be included in satisfying tangible capital, and had to be amortized on a 20–year basis in calculating risk-based and core capital. *Id.*

Many thrifts had become accustomed to recording supervisory goodwill on their books. Because the FIRREA prohibited them from continuing this practice, the affected thrifts recorded unanticipated decreases in the assets portions of their books. *Winstar Corp. v. United States* involved three thrifts that had brought forward breach of contract claims against the Government in the Court of Federal Claims, and had their cases consolidated for the purposes of their interlocutory appeal. *Winstar Corp. v. United States,* 64 F.3d at 1534. They alleged that the FHLBB had promised that they could count supervisory goodwill toward regulatory capital requirements, and that the passage of the FIRREA constituted a breach of those promises. *Id.* One of the three thrifts was Glendale Federal Bank, which specifically argued that it had an express contract with the government allowing it to record supervisory goodwill for regulatory capital purposes. *Id.* .

The Federal Circuit upheld Judge Smith's determination that: (1) the government had entered into either express or implied-in-fact contracts allowing these three thrifts to record supervisory goodwill as regulatory capital; and that (2) these promises had been breached by the enactment of the FIRREA. *Id.* More specifically, with the Glendale transaction, the Federal Circuit agreed with both the plaintiff and Judge Smith on the issue of contractual liability. *Id.* The Supreme Court affirmed. *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

## II. The Equitable Federal Savings and Loan Acquisition

### A. Facts

The story of the Equitable transaction, however, began before the *Winstar* opinion and before the passage of the FIRREA. It involved Citizens Federal Savings Bank's (Citizens) acquisition of Equitable Federal Savings and Loan Association of Lancaster, Ohio (Equitable), an insolvent savings and loan institution, on July 9, 1986. The process of acquiring Equitable began in 1985, when the FHLBB and FSLIC solicited Citizens to submit a proposal to acquire Equitable. On October 22, 1985, Citizens and Citizens Savings Financial Corporation (CSFC) submitted a bid, and then an amended bid (Bid Letter) on April 28, 1986. Their Bid Letter asked FSLIC: (1) to purchase cumulative preferred stock, which CSFC would issue to FSLIC for $97.1 million, (2) to provide FSLIC a note for $36 million and (3) to indemnify the resulting institution against certain potential losses. The Bid Letter also expressly asked for FHLBB's permission to allow Citizens to use the purchase method of accounting. It provided as follows:

> For regulatory purposes, the [FHLBB] will approve the adjustment of assets of Equitable in accordance with the purchase or pushdown method of accounting. Under such method, the value of any intangible assets resulting from this accounting will be amortized by Citizens Federal over a period of 25 years by the straight line method in accordance with GAAP (Generally Accepted Accounting Principles).

After the FHLBB and the FSLIC selected Citizens' and CSFC's bid as the most attractive, Citizens and Equitable entered into a Merger Agreement. The Merger Agreement was expressly conditioned upon the execution of an Assistance Agreement containing terms satisfactory to the FSLIC and "substantially comply[ing] with those in [the Bid Letter] ... and as may be specified in subsequent revisions to the Bid Letter."

Citizens, CSFC and FSLIC entered into an Assistance Agreement on July 8, 1986. The Assistance Agreement incorporated the FHLBB Resolution ("Resolution"), which stated as follows:

> § 18 *Accounting* Principles. Except as otherwise provided herein, any computations made for purposes of this Agreement shall be governed by generally accepted

accounting principles as applied in the savings and loan industry. . . .

The Assistance Agreement also included an integration clause, which provided as follows:

§ 25 *Entire Agreement, Severability*

(a) This Agreement . . . together with any interpretation or understanding agreed to in writing by the parties, constitute the entire agreement between the parties and supersede all prior agreement and understandings of the parties relating to the purchase of the Series A preferred Stock or other forms or assistance from the Corporation, excepting only any resolutions or letters issued contemporaneously with this Agreement by the Bank Board or the Corporation.

The FHLBB Resolution, issued contemporaneously with this Agreement provided as follows:

Citizens shall use generally accepted accounting principles prevailing in the savings and loan industry . . . Citizens shall furnish an analysis, accompanied by a concurring opinion from its independent public accountants, satisfactory to the Supervisory Agent and to the Office of Examinations and Supervision, which (1) specifically describes as of the Effective Date any intangible assets, including goodwill, or the discounts and premiums arising from the Merger to be recorded on Citizens's consolidated books; and (2) substantiates the reasonableness and conformity with regulatory requirements of the amounts attributed to intangible assets, including goodwill, and the discounts and premiums and the related amortization periods and methods. . .

The FHLBB also issued a Forbearance Letter on July 3, 1986. In the letter, the FHLBB agreed to six regulatory waivers and forbearances. It did not, however, refer to any particular accounting treatment of supervisory goodwill or to any amortization period.

Citizens and Equitable consummated the merger on July 9, 1986, in accordance with the terms of their agreement. Citizens subsequently furnished the government with both an analysis and a concurring opinion from independent accountants, as directed by the FHLBB Resolution. Citizens recorded supervisory goodwill in the amount of $35.9 million as a result of the acquisition of Equitable. The goodwill was to be amortized on a straight-line basis over a period of 25 years. After the merger, Citizens continued to book supervisory goodwill as an asset included in capital for regulatory purposes. It could not continue to do so, however, after the passage of the FIRREA.

Plaintiffs have filed breach of contract claims alleging that: (1) the government entered into an express contract allowing Citizens to record supervisory goodwill for regulatory capital purposes with respect to the Equitable transaction; and (2) that the passage of the FIRREA constituted a breach of that express contract.

### B. Discussion

Plaintiffs argue that the terms of the Equitable transaction are materially identical to the ones in the Glendale transaction in *Winstar*. The Court finds that the terms in the two transactions were sufficiently similar to conclude that Defendant promised to allow Citizens to treat supervisory goodwill as regulatory capital, as long as certain conditions were satisfied. While there are some differences between the Glendale and Equitable transactions, these differences do not make the cases legally distinguishable. Because Citizens satisfied the enumerated conditions, Citizens was entitled to treat supervisory goodwill as regulatory capital. Defendant therefore breached the terms of its contract with Plaintiffs by passing FIRREA.

#### 1. The Glendale Transaction

In the Glendale transaction, the FSLIC entered into a Supervisory Advisory Agreement (SAA) with Glendale that included an integration clause, which, in the Federal Circuit's view, brought all contemporaneous documents into the contract. *Winstar Corp. v. United States*, 64 F.3d at 1540.

One of those contemporaneous documents was Bank Board Resolution 81–710, which provided as follows:

Not later than sixty days following the effective date of the merger, Glendale shall furnish an opinion from its independent accountant, satisfactory to the Supervisory Agent, which (a) indicates the justification under generally accepted accounting principles for use of the purchase method of accounting for its merger with Broward, (b) specifically describes, as of the Effective Date, any goodwill or discount of assets arising from the merger to be recorded on Glendale's books, and (c) substantiates the reasonableness of amounts attributed to goodwill and the discount of assets and the resulting amortization periods and methods; and Glendale shall submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with FHLBB Memorandum R–31b; . . .

*Id.*

Memorandum R–31b, referred to in Bank Board Resolution 81–710, provided as follows:

[Its purpose is to] set[ ] forth guidelines for the staff of the Federal Home Loan Board in reviewing the proposed accounting, under generally accepted accounting principles, for goodwill arising in the acquisition of a savings and loan association. This intangible asset generally results when the purchase price for an institution exceeds the fair value of the assets acquired, reduced by the fair value of any liabilities assumed. It only arises when the accounting for a business combination is in accordance with the purchase method.

*Statesman Sav. Holding Corp. v. United States.*, 26 Cl.Ct. 904, 910 (1992).

The Memorandum also stated that in accordance with applicable accounting principles, the period of amortization would be limited to 40 years or less. *Winstar Corp.,* 64 F.3d at 1541.

The Federal Circuit held that the Resolution clearly evidenced approval of the terms of the merger, including the terms that (1) the purchase method of accounting could be employed; (2) that goodwill arising from the merger could be recorded on Glendale's books; and (3) that such goodwill could be

amortized for reasonable periods under reasonable methods, provided that Glendale was able to obtain the approval of the Supervisory Agent. *Id.*

The court also examined (1) the independent accountant's opinion that Glendale submitted to the government, (2) Glendale's stipulation, which was required by the Resolution, and (3) a letter sent by the FSLIC director to the FHLBB recommending the use of the purchase method of accounting. After doing so, it determined that Glendale had obtained approval from the Supervisory Agent. *Id.* The FHLBB and the FSLIC were therefore bound to recognize supervisory goodwill and the amortization periods reflected in the accountant's letter. *Id.* at 1541–42.

### 2. The Equitable Transaction

#### a. Terms of the Merger

Defendant points to several differences between the Glendale and Equitable transactions in an attempt to distinguish them.

■ First, the Resolution in the Equitable transaction did not incorporate Memorandum R–31b, which limited the period of amortization of supervisory goodwill to 40 years or less. Defendant argues that since Memorandum R–31b was not incorporated into the Resolution, the Equitable documents did not limit the term of the amortization period, as was the case in the Glendale transaction. But the purpose of the Memorandum was to make part of the agreement the FHLBB's own "guidelines" with respect to approving business combinations, that is, its policy of approving business combinations only if they accorded with accepted accounting principles. The 40–year amortization period specified in the Memorandum merely reflected the maximum term allowed under "applicable accounting principles". In the Equitable transaction, the Resolution already required Citizens to use generally accepted accounting principles (GAAP); thus, incorporation of the 40–year term limit would have been a redundancy. The essence of both Resolutions was that the FHLBB would allow the acquiring companies to amortize goodwill, in accordance with accepted ac-

counting principles. The resolutions therefore reflected only the maximum periods of amortization allowable under accepted accounting principles, not the actual amortization periods agreed to by the parties. In both transactions, the actual periods of amortization were not agreed to until the independent accountants submitted their opinion letters.

■ Second, although the Resolution in the Glendale transaction expressly used the term "purchase method of accounting," the Resolution in the Equitable transaction did not. But whether the Equitable Resolution actually contained that term is insignificant, if Defendant actually promised to allow it to record supervisory goodwill on its accounting books. The Equitable Resolution explicitly contemplated that Plaintiff would record goodwill on its books; moreover, by doing so it implied that Plaintiff was entitled to use the purchase method of accounting. In a business combination scenario, one records goodwill only if one is using the purchase method of accounting. The language employed by the FHLBB in its own Memorandum R–31b confirms this: goodwill "only arises when the accounting for a business combination is in accordance with the purchase method." *Statesman Sav. Holding Corp.*, 26 Cl.Ct. at 910.

The Supreme Court opinion in *Winstar* sheds more light on the relationship between recording goodwill and the purchase method of accounting. The purchase method of accounting "permits the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible called 'goodwill'". *United States v. Winstar Corp.*, 518 U.S. at 849, 116 S.Ct. 2432 (quoting R. Kay & D. Searfoss, Handbook of Accounting and Auditing 23–21 to 23–40 (2d ed.1989)). Goodwill is "measured by the difference between the cost of the ... enterprise acquired and the sum of the assigned costs of individual tangible and identifiable assets acquired less liabilities assumed." *Id.* (citing Accounting

Principles Board Opinion No. 17, P.26, p. 339 (1970)). In other words, an acquiring entity would normally be allowed to record only the fair value of all identifiable assets. Under the purchase method of accounting, it is allowed to add a little something else called "goodwill", an intangible asset. Logically then, one uses the purchase method of accounting by adding goodwill to one's books, and by treating it as an asset.

Defendant argues that since the Forbearance Letter did not mention supervisory goodwill, this court cannot conclude that the alleged promises were made. The fact that the Forbearance Letter failed to mention supervisory goodwill does not contradict this Court's finding. As in *Winstar*, this Court bases its ultimate finding with respect to the question at hand not only on the Forbearance Letter, but also on other contemporaneous documents flowing between the parties. *Statesman Sav. Holding Corp.*, 26 Cl.Ct. at 913. In this case, the contemporaneous documents would include the Assistance Agreement, the Resolution, and all other contemporaneous letters.

### b. Satisfaction of the Agreement's Terms

The final piece of the puzzle of Plaintiffs' contract with Defendant was that, according to the Assistance Agreement, Citizens had to furnish an analysis accompanied by a concurring opinion from its independent public accountants satisfactory to the Supervisory Agent and the Office of Examinations and Supervision (OES).[1]

The facts support a finding that the government manifested approval of the terms set forth in the Opinion Letter. At his deposition, Alfred Camner, who acted as legal advisor and lead negotiator for Equitable, testified that the "accounting people were setting the standard and [that] they were pushing the idea that they should have 25 years. And that's what they were telling the supervisory agents in the field, that they

---

1. The government does not appear to dispute that the terms of the Opinion Letter were satisfactory to the Supervisory Agent and to the OES. It focuses its attention on the issue of whether or not the Opinion Letter made express promises allowing Citizens to record supervisory goodwill. The record clearly indicates that Citizens submitted an analysis and independent opinion, and obtained the sought for approval.

preferred 25 years." Alfred Camner Tr. at 44. Further along in the deposition, Mr. Camner was asked whether the ability to count supervisory goodwill as regulatory capital was a specific term in the transaction documents. *Id.* at 45. He replied by stating as follows:

> Everything was a set process, so that what you agreed on was then arranged so that everything was accepted, essentially, in a sense, simultaneously. So what you did, if you agreed on 25 years, then you would place it in a document and the agency would sign off that you got 25 years and you were allowed to put it on your capital account, that's how they did it.

*Id.* at 53. In other words, the supervisory agent had to approve in order for supervisory goodwill to be put on the capital account to be amortized for 25 years. Mr. Camner reiterated later in the deposition:

> [Y]ou were told what you got ... it was originally 40. We finally settled on 25. And the process was that you did that, that the supervisory agents then approved that as your capital ... It was understood by everybody at the table that that's what happened.

*Id.* at 53–54.

In compliance with the terms of the FHLBB Resolution, Citizens furnished the FHLBB with the requested analysis. On December 5, 1986, Dennis Holthaus, Senior Vice President and Treasurer of Citizens sent to James DeBenedictus, the Supervisory Agent, an analysis of the adjustments made to its books, as a result of the acquisition of Equitable. It stated that the "cost in excess of the net assets acquired (goodwill) in the transaction is $30.6 million which will be amortized on a straight-line basis over 25 years in accordance with generally accepted accounting principles (GAAP) which are the same as regulatory accounting principles (RAP) in this matter." The analysis also broke down the composition of the goodwill resulting from the merger.

Deloitte, Haskins & Sells, the independent accountant, then issued a concurring opinion. The Opinion Letter referenced the Assistance Agreement, the Merger Agreement and the December 5, 1986 analysis. It also stated that the amounts attributed to goodwill, including related amortization amounts, in the analysis were "determined in conformity with generally accepted accounting principles and FHLBB regulatory principles." It opined that "25 years is representative of the period that [would] be benefited from goodwill." Further, the "straight-line method of amortization for ... the goodwill is representative of the time pattern in which benefits [would] be derived."

In conclusion, Citizens satisfied the conditions set out in the FHLBB Resolution by submitting both the independent accountant's opinion and its analysis. Moreover, the submissions appear to have been satisfactory to the applicable regulatory agents.

### c. Breach of Contract

█ As in the Glendale transaction, "[t]here can be no question that the application of the FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods ... was a breach." *Winstar v. United States,* 64 F.3d at 1544. When Citizens satisfied the conditions set forth by the contractual documents, "the government's contractual documents became effective and required it to recognize and accept the purchase method of accounting for the mergers and the use of supervisory goodwill and capital credits as capital assets for regulatory capital requirements." *Id.* at 1545. After the FIRREA and the implementing regulations, the bank regulatory agencies prohibited Citizens from recording supervisory goodwill in the manner that it had been promised. Therefore, with respect to the Equitable acquisition, the Court finds that Defendant breached the contractual rights of Plaintiffs to the use of supervisory goodwill for regulatory capital requirements.

### III. American Transaction

Plaintiffs argue that Defendant conceded liability for breach of contract regarding the American transaction. Pls.' April 11, 2001 Br. at 3. A survey of Defendant's briefing in this case reveals a progression from an initial concession of liability to modification of that

concession to major qualification of that concession. In its first brief, Defendant stated: "With respect to the American acquisition, the Government does not dispute that contractual promises were made to Citizens concerning the accounting and regulatory capital treatment of supervisory goodwill, and that FIRREA was inconsistent with those promises." Def.'s February 18, 1997 Br. at 2, n. 2. In its Reply Brief in support of its cross-motion for summary judgment, Defendant referred to its earlier concession but modified it to assert that if the FHLBB promised to allow Citizens to count supervisory goodwill as regulatory capital, it only promised to do so for 5 years. Def.'s June 27, 1997 Br. at 2. After Chief Judge Smith filed his opinion in *California Federal Bank v. United States*, 39 Fed.Cl. 753 (1997), he ordered the parties in other *Winstar*-related cases, including this case, to show cause why all plaintiffs' motion for summary judgment on liability should not be granted in those cases in light of his decision. *Id.* at 779. The *California Federal* decision included three other cases that were selected "to ventilate the broadest cross-section of the contractual defenses raised by the defendant." *Id.* at 758. Thus, Chief Judge Smith hoped at least to cut down significantly on the number of separate liability decisions. *Id.* However, he did not render a decision on the Show Cause Order when this case was transferred to this judge.

In its Supplemental Brief filed with this Court, Defendant argues that it only conceded that, "if the reasoning of *California Federal* were applied, the Government's liability arguments with respect to the American transaction would not prevail." Def.'s March 28, 2001 Supp. Br. at 1. It argues that it did not agree to the "common issue" formulations that generated the *California Federal* decision, that it challenged the validity of the "show cause" procedure on appeal in *California Federal*, that the common issues approach of *California Federal* improperly shifted the burden of proof, and that *California Federal* cannot govern this case as it did not directly discuss the claims of Citizens. *Id.* at 6–9. Consequently, Defendant asks

the Court to treat *California Federal* as it would any other decision of the Court of Federal Claims. In addition, Defendant argues that it raised "several defenses" to liability regarding the American transaction. *Id.* at 5.

After Defendant's Supplemental Brief was filed, the Federal Circuit rendered its decision in *California Federal Bank v. United States*, 245 F.3d 1342 (2001). As Plaintiff has pointed out in its Supplemental Brief filed after the Federal Circuit's opinion, "the Federal Circuit [in *California Federal*] found liability without commenting on the government's objections to the process employed by the court." Pl.'s April 11, 2001 Br. at 6. Thus, the Federal Circuit's decision disposes of Defendant's procedural objections. Accordingly, this Court will take up where Chief Judge Smith left off and, by looking at the arguments in response to the Show Cause order, determine the status of Defendant's arguments against liability.[2]

Applying Chief Judge Smith's *California Federal* decision to the American transaction, Defendant concluded in its response to the Show Cause Order: "Given that documents of this type [i.e., the type referred to in *California Federal*] exist in this case, we can offer no reason why, if our interpretation of the Court's ruling [in *California Federal*] is correct, the Court should not hold that a contract regarding the use of goodwill to satisfy the Government's minimum capital requirements was formed in that transaction." Def.'s Resp. to Show Cause Order at 22. Furthermore, as already mentioned, Defendant stated in its Supplemental Brief filed before this Court: "[I]f the reasoning of *California Federal* were applied, the Government's liability arguments with respect to the American transaction would not prevail." Def.'s March 28, 2001 Supp. Br. at 1. As the Federal Circuit found no objection to the procedure employed in *California Federal*, and as the Federal Circuit in *California Federal* upheld Chief Judge Smith's decision in that case, and as Defendant has conceded— at least—that the reasoning of *California*

2. This Court's statement that the *California Federal* decision was not binding on this Court, made during a status conference on March 2, 2001, was, of course, a statement of general principle and not a ruling from the bench. *See* Def.'s March 28, 2001 Br. at App. 31.

*Federal* would defeat its arguments against contractual liability in this case, this Court holds that the Defendant is liable for breach of contract in the American transaction.

## IV. Conclusion

The Plaintiffs' motion for partial summary judgment is GRANTED and the Defendant's motion for summary judgment is DENIED.