# United States Court of Appeals for the Federal Circuit

03-5070, -5082

CALIFORNIA FEDERAL BANK,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

Mark A. Perry, Gibson, Dunn & Crutcher LLP, of Washington. DC, argued for plaintiff-appellant.  With him on the brief were John C. Millian, Theodore J. Boutrous, Jr., Paul Blankenstein, and Andrew S. Tulumello.  Of counsel was Thomas G. Hungar.

Lee M. Straus, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross-appellant.  With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General; David M. Cohen, Director; Jeanne E. Davidson, Deputy Director; and Tarek Sawi, Trial Attorney.

Appealed from:     United States Court of Federal Claims

Judge Robert H. Hodges, Jr.

# United States Court of Appeals for the Federal Circuit

03-5070,-5082

CALIFORNIA FEDERAL BANK,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Cross Appellant.

_____

DECIDED:  January 19, 2005

_____

Before MAYER,[*] BRYSON, and LINN, Circuit Judges.

BRYSON, Circuit Judge.

This case, like others that have reached this court in the wake of the Supreme Court's decision in United States v. Winstar, 518 U.S. 839 (1996), involves a claim of breach of contract based on the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183 (1989). In the 1980s, in the midst of the savings and loan crisis, the Federal Savings and Loan Insurance Corporation ("FSLIC") arranged for various healthy financial institutions to acquire failing savings and loan associations (or "thrifts").  FSLIC settled on the acquisition strategy to minimize the number of outright failures among savings and loan

_____

[*]    Haldane Robert Mayer vacated the position of Chief Judge on December 24, 2004.

associations and the consequent financial burden on FSLIC, as insurer of the deposits of many of those thrifts. Because the failing thrifts were unattractive investment prospects on their own, FSLIC had to offer substantial incentives to the acquiring institutions to induce them to acquire the failing thrifts and take on their liabilities. The inducements frequently consisted of promises regarding the manner in which the acquiring institutions would be permitted to treat the acquired thrifts' assets and liabilities for accounting purposes. In many instances, FSLIC promised the acquiring institutions that they would be allowed to include the acquired thrifts' net liabilities as "supervisory goodwill" in their calculation of regulatory capital and to amortize the supervisory goodwill over a lengthy period of time.

In 1981 and 1982, appellant California Federal Bank ("CalFed") acquired the assets and assumed the liabilities of six failing thrifts in acquisitions supervised or approved by FSLIC or its parent, the Federal Home Loan Bank Board ("the FHLBB"). As part of the acquisition transactions, FSLIC and the FHLBB promised CalFed that it could include more than $600 million in "supervisory goodwill" in calculating its regulatory capital and that it could amortize that supervisory goodwill over an extended period. After the enactment of FIRREA in 1989 and the promulgation of conforming regulations, however, acquiring institutions such as CalFed were no longer permitted to include supervisory goodwill as part of their regulatory capital, and they were required to write down their supervisory goodwill over a five-year period.

Based on the new restrictions on the use and amortization of supervisory goodwill, many acquiring institutions sued the government in the Court of Federal Claims contending that the new requirements resulted in a breach of the acquisition

contracts. In the Winstar case, the Supreme Court held that the breach of the promises regarding the maintenance of regulatory capital and the depreciation of supervisory goodwill could constitute a breach of contract by the government for which acquiring institutions could recover damages.

CalFed was one of the institutions that filed a breach of contract action based on the FIRREA provisions regarding supervisory goodwill. The trial court granted summary judgment for CalFed on the issue of liability. Cal. Fed. Bank v. United States, 39 Fed. Cl. 753 (1997). CalFed then sought to recover damages on several theories, including a "lost profits" theory. With regard to that theory, CalFed contended that the statutory and regulatory changes associated with the enactment of FIRREA forced it to sell certain assets, including a large number of adjustable rate mortgages ("ARMs") in order to meet the new regulatory capital requirements. Those ARMs, according to CalFed, would have produced substantial profits if CalFed had been able to retain them. The trial court, however, granted summary judgment for the government on that theory of recovery. Cal. Fed. Bank v. United States, 43 Fed. Cl. 445 (1999). After a trial on the remaining claims, the court denied reliance damages and restitution, but it awarded CalFed $23 million to compensate CalFed for the cost of replacing the regulatory capital lost because of the accelerated phase-out of supervisory goodwill under FIRREA.

Both parties appealed to this court. We affirmed the grant of summary judgment on the issue of liability, but reversed the grant of summary judgment on CalFed's lost profits theory, holding that there were genuine issues of material fact with respect to foreseeability, causation, and the measurement of damages. Cal. Fed. Bank, FSB v.

United States, 245 F.3d 1342 (Fed. Cir. 2001). Accordingly, we remanded for trial on damages based on CalFed's lost profits theory.

Following a six-week trial, the Court of Federal Claims declined to award CalFed lost profits damages. Cal. Fed. Bank v. United States, 54 Fed. Cl. 704 (2002). The court based its ruling on three general findings: (1) that CalFed had failed to prove its loss of profits from the sale of the assets, including the ARMs, was foreseeable; (2) that CalFed had failed to prove that the ARMs and other assets were sold because of the breach; and (3) that the method of calculating damages advocated by CalFed was too speculative to serve as the basis for a damages award.

CalFed has appealed from the trial court's denial of damages on a lost profits theory. The government has cross-appealed with respect to the issue of liability, contending that FSLIC did not have the authority to bind the United States contractually with respect to the acquisition transactions.

I

A

Contract remedies are designed to make the nonbreaching party whole. One way to achieve that end is to give the nonbreaching party "expectancy damages," i.e., the benefits the nonbreaching party expected to receive in the absence of a breach. Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1379 (Fed. Cir. 2001), citing Restatement (Second) of Contracts § 344(a) (1981). In order to be entitled to expectancy damages, which include lost profits, the plaintiff must satisfy three requirements. First, the plaintiff must show that the lost profits were within the contemplation of the parties because the loss was foreseeable or because the

defaulting party had knowledge of special circumstances at the time of contracting.  La Van v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002), citing Restatement (Second) of Contracts § 351(1) (1981).  Second, the plaintiff must establish that there would have been a profit but for the breach.  Rumsfeld v. Applied Cos., 325 F.3d 1328, 1339 (Fed. Cir. 2003).  Third, the measure of damages must be reasonably certain, although if "a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."  Glendale Fed. Bank, FSB v. United States, 378 F.3d 1308, 1313 (Fed. Cir. 2004), quoting Locke v. United States, 283 F.2d 521, 524 (Ct. Cl. 1960).

For the reasons set forth below, we uphold the trial court's judgment based on its ruling on the issue of causation.  Because that issue is dispositive of CalFed's appeal, we need not address the issues of foreseeability and the measurement of damages on which the trial court also ruled against CalFed.

B

CalFed first argues that the trial court used the wrong standard in determining whether CalFed proved that the government's breach caused the bank to sell the ARMs.  The court relied on Myerle v. United States, 33 Ct. Cl. 1, 27 (1897), for the standard of causation that lost profits must "inevitably and naturally, not possibly nor even probably" flow from the defendant's breach.  Citing Bluebonnet Savings Bank, F.S.B. v. United States, 266 F.3d 1348 (Fed. Cir. 2001), CalFed argues for a less exacting standard; it contends that the breach need only be a "substantial factor"

contributing to the loss.  The Court of Federal Claims stated that it would reach the same conclusion regardless of which of the two standards is applied.

The passage from the Bluebonnet case on which CalFed relies does not state or imply that the causation requirement is satisfied any time the breach is a "substantial factor" in causing the claimed lost profits.  The court in Bluebonnet noted that the trial court had found that the breach "was a substantial factor in Bluebonnet's increased financing costs," 266 F.3d at 1356, reflecting the way the trial court characterized its finding.  See Bluebonnet Sav. Bank, FSB v. United States, 47 Fed. Cl. 156, 173, 180 (2000).  Importantly, however, the court upheld the trial court's ruling on causation only after concluding that "[t]he government's various arguments regarding alternative causes for the damages lack merit."  266 F.3d at 1356.  That statement is consistent with the standard applied by this court and our predecessor court in numerous cases, including the previous appeal in this case, that the causal connection between the breach and the loss of profits must be "definitely established."  La Van v. United States, 382 F.3d at 1351; Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1379 n.2 (Fed. Cir. 2004); Energy Capital Corp. v. United States, 302 F.3d 1314, 1325 (Fed. Cir. 2002); Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1349 (Fed. Cir. 2001); Neely v. United States, 285 F.2d 438, 443 (Ct. Cl. 1961).  The standard set forth in those cases ensures that the nonbreaching party will not be awarded more than it would have received if the contract had been performed.  Applied Cos., 325 F.3d at 1340.  Thus, the Court of Federal Claims correctly rejected the "substantial factor" test advocated by CalFed.

That is not to say that the breach must be the sole factor or sole cause in the loss of profits. The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach. See, e.g., E. Allan Farnsworth, Contracts § 12.1, at 150-51 (3d ed. 2004). However, lost profits are "a measurement of what a party would have received absent the breaching party's action," Cienega Gardens v. United States, 331 F.3d 1319, 1341 (Fed. Cir. 2003), i.e., those losses that would not have occurred but for the breach, see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory.

C

At trial, CalFed based its lost profits case on three theories of loss: (1) that the government's breach forced it to shrink the size of the bank by selling nearly 25,000 ARMs, which would have proved highly profitable if CalFed had retained them; (2) that the breach forced CalFed to sell California Thrift & Loan ("CTL"), an automobile financing company, which also would have proved profitable if CalFed had retained it; and (3) that the breach forced CalFed to forgo making various other highly profitable loans that it would have made if it had not had to satisfy the more exacting capital requirements following the enactment of FIRREA. In its opinion entered following the trial, the trial court rejected each of those theories on factual grounds.

With respect to the ARMs, the trial court rejected CalFed's assertion that the breach caused it to dispose of the 24,664 ARMs that it claimed to have sold in order to meet the more exacting capital requirements imposed following FIRREA's enactment.

The court concluded that it was the recession in the California real estate market in the early 1990s that "caused CalFed to shrink the bank," not the changes in regulatory requirements that resulted from the enactment of FIRREA. As to CalFed's argument that FIRREA precipitated a massive sell-off of ARMs, the court noted that CalFed had sold a roughly similar number of ARMs prior to the breach and that the bank's "business was selling loans, before and after the breach." Contrary to CalFed's contention, the court found that the evidence at trial showed that originating mortgage loans and selling them into the secondary market was an integral part of CalFed's operations and that its business plan of originating and selling mortgage loans did not change after the breach.

Based on the evidence at trial, the court found that CalFed "likely would have sold most of its adjustable rate mortgages irrespective of the breach." The court noted that at the time CalFed was selling the ARMs, it was investing in higher risk loans, which required higher capital ratios. From that evidence, the court concluded that CalFed chose to sell the ARMs, rather than cease acquiring high-risk assets, because it preferred to continue high-risk lending. The court also noted that the evidence showed that CalFed had good reasons to sell the ARMs: the sale satisfied management's desire to generate a higher ratio of tangible net worth to tangible assets, and the bank recorded capital gains of $28 million on the sales, which it used to offset losses. Based on all the evidence, the court concluded that CalFed could have remained in capital compliance without selling the ARMs in the aftermath of the breach and that the bank "likely would have sold many or most of its adjustable rate mortgages had the breach not occurred."

With respect to the sale of CTL, the trial court similarly rejected CalFed's argument that the breach forced it to sell. Instead, the court found that CalFed sold CTL because "it did not fit into [CalFed's Chief Executive Officer Jerry St. Dennis's] 'back-to-basics' plan for the company." The court explained that Mr. St. Dennis "wanted to return the bank to traditional lending strategies that had made it successful. He did not view the automobile finance company as such a business." Moreover, the court found that at the time CalFed sold CTL, CalFed's capital obligations had already been satisfied, so it was not necessary for CalFed to sell CTL. Based on the evidence, the court concluded that Mr. St. Dennis "wanted to sell the automobile financing business . . . . [CalFed] was not forced to sell CTL because of the breach."

With regard to the other forgone assets, CalFed claimed that it suffered damages because the capital maintenance requirements forced it to forgo making other highly profitable loans and that it is entitled, as damages, to an award of the profits that it would have made on those other investments. In particular, CalFed claimed that over time it would have replaced the maturing ARMs with other profitable loans and investments. As to the "forgone assets" claim, the trial court found that CalFed had failed "to explain credibly how it would have supported these highly profitable loans if it could have made them, or why they would have been highly profitable." The court explained that its finding on that issue was based on its discrediting the testimony of CalFed's expert as to the profitability of these unidentified assets. The court found persuasive the testimony of one of the government's experts, who pointed out that the bank was operating in a highly competitive environment at the time and that the acquisition of additional assets would not necessarily have yielded additional profits. In

fact, as the court noted, CalFed's return on assets during the period 1990-96 was actually negative.

Summarizing its findings on the issue of causation, the trial court stated that the facts developed at trial did not support the basic premise of CalFed's theory—that post-breach provisions such as the increased capital maintenance requirements and the reduction of supervisory goodwill, which forced the bank to shrink, necessarily cost the bank money. For example, the court pointed out, CalFed lost $20 million in 1990 with $20 billion in assets, while it earned a profit during 1995-96 with only $15 billion in assets. The court concluded that "[s]hrinking the bank in the midst of a serious recession in fact was a very good idea for CalFed" and that CalFed therefore failed to prove with the requisite certainty that the breach caused it to lose profits that it would have obtained in the absence of the breach. Thus, as the court put it, CalFed "did not prove that losing goodwill or replacing it with tangible capital affected its profits adversely."

D

On appeal, CalFed focuses on the post-FIRREA sale of the ARMs and on the profits that it asserts it lost by being forced to sell those assets. CalFed contends that the trial court committed clear error in finding that it failed to prove a sufficient causal connection between the breach and CalFed's loss of profits on the ARMs that it claims it would have made in the absence of a breach. CalFed's task in challenging this intensely factual determination on appeal is an exacting one. First, CalFed faces a daunting standard of review in asking us to overturn factual findings made by the trial court after hearing six weeks of sharply conflicting evidence. See Bluebonnet Sav.

Bank, F.S.B., 266 F.3d at 1356 (causation is "a question of fact reviewed under the clear error standard"). Moreover, CalFed's theory of expectancy damages is one that we have characterized as "impractical for these [Winstar] cases, and generally not susceptible to reasonable proof," noting that "given the speculative nature of such a damages claim, [such a claim] has yet to be successfully established in any Winstar case" and that "experience suggests that it is largely a waste of time and effort to attempt to prove such damages." Glendale Fed. Bank, FSB, 378 F.3d at 1313. After a detailed review of the evidence on which the court based its finding, we are not persuaded that CalFed has demonstrated that the trial court committed clear error.

CalFed asserts that the best evidence as to the critical question whether CalFed would have retained the ARMs in the absence of a breach is the testimony of CalFed's officers, who testified that if CalFed had not had to meet the post-FIRREA capital maintenance requirements, it would have retained the ARMs. CalFed argues that on the question of why the ARMs were sold, it was improper for the court to rely on the testimony of the government's experts rather than the testimony of CalFed's fact witnesses, who testified about their own intentions.

The fact-finder's freedom to consider, credit, and discount various items of evidence is not as narrow as CalFed suggests. The court, sitting as finder of fact, was entitled to weigh the credibility of CalFed's fact witnesses, taking into account their interest in the outcome of the litigation. At the same time, the court was entitled to consider the government's expert testimony to the extent that it shed light on the economics of finance and banking and thus helped explain why CalFed sold the ARMs following FIRREA's enactment. Although expert testimony lacking a sound scientific

basis should be excluded, <u>see</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), the expert testimony offered by the government in this case did not lack a sound scientific basis and therefore it did not constitute an abuse of discretion for the trial court to consider it, <u>see</u> <u>Seaboard Lumber Co. v. United States</u>, 308 F.3d 1283, 1301-02 (Fed. Cir. 2002).

The expert testimony on which the court relied in this case provided an explanation of why a bank such as CalFed might well have chosen to dispose of the ARMs, even in the absence of the breach, rather than retaining them, and why the sale of the ARMS did not necessarily result in a loss to CalFed. The expert testimony thus satisfied the requirement of Rule 702 of the Federal Rules of Evidence, which permits expert testimony to be admitted "to assist the trier of fact to understand the evidence or to determine a fact in issue." Accordingly, it was not improper for the court to rely on the government's expert testimony to assist it in making its factual findings on the causation issue.

One of the government's experts, Professor Daniel Fischel, testified extensively about the economics of capital requirements and the economic consequences of shedding assets in order to comply with capital requirements. With regard to CalFed's argument that the phasing out of supervisory goodwill deprived CalFed of the ability to leverage its assets, Professor Fischel stated that the idea that "leverage creates wealth" is a fallacy:

> You lose the stream of income that you would have had if you held on to
> the asset, but at the same time you avoid the interest expense that you
> also would have had if you held on to the asset. And unless there's some
> reason to believe that you know something about these assets that the
> party on the other side of the transaction doesn't know, which isn't really
> very likely in a case of something like a mortgage loan or mortgage-

backed security, the asset will sell for its fair value and the income that you lose will exactly offset, certainly as a first approximation, the interest expense that's avoided.

Moreover, Professor Fischel explained that CalFed's behavior was inconsistent with its theory that the sale of the ARMs deprived it of the ability to leverage its assets in a way that would generate large profits. In particular, he found it highly significant that for periods both before and after the enactment of FIRREA, CalFed sold roughly the same number of ARMs. He explained that if the bank's "less leverage, less profits" hypothesis were true, CalFed would have stood to lose just as much from the sale of ARMs before the breach as it claimed to have lost afterwards.

In light of the evidence that selling ARMs was part of CalFed's normal business strategy, Professor Fischel concluded that CalFed's explanation at trial for why it sold ARMs before the enactment of FIRREA—that it sold the ARMs as a means of controlling growth—did not provide a rational basis for distinguishing the pre-FIRREA ARMs sales from the post-FIRREA sales. Professor Fischel explained that if CalFed had regarded the ARMs as highly profitable, as CalFed's expert contended, it would have made more sense for CalFed to have originated fewer high-risk loans and to have purchased fewer high-risk assets, rather than selling the ARMs.

Finally, Professor Fischel, together with another government expert, Dr. William Hamm, criticized the analysis of CalFed's expert, Professor Christopher James, who testified in support of CalFed's claim for lost profits. Professor Fischel and Dr. Hamm criticized various details of Professor James's model, as well as Professor James's assumptions about what CalFed would have done with the profits it would have earned from the ARMs, which did not comport with what CalFed was, in reality, doing at the

time. Professor Fischel stated that Professor James's model depended on CalFed's investing much of its capital in mortgage-backed securities because those assets were very profitable. But Professor Fischel said that those securities were not in fact highly profitable. Instead, he explained that they were used to strengthen the bank's regulatory capital position because they had a lower risk weighting and thus would not be used to make a high profit. In fact, at that time CalFed was not investing in the low-risk mortgage-backed securities but instead was investing in high-risk loans. Thus, Professor Fischel concluded, Professor James's model of causation simply did not conform to the reality of what CalFed was doing at the time FIRREA was enacted. He explained that it is more likely that, in the absence of a breach, CalFed would have continued to invest in high risk loans and not the safer mortgage-backed securities that Professor James assumes it would have invested in and profited from.

In addition to the testimony of its officers and its expert, CalFed relied on certain documentary evidence to support its claim that the breach forced it to sell the ARMs, which it otherwise would have retained. On appeal, CalFed points in particular to its 1991 quarterly report to shareholders, which stated that CalFed "reduc[ed] . . . the level of interest earning assets as the Bank continues to downsize" and that "[t]he decrease in interest earning assets is primarily the result of the sale by the Bank of certain mortgage-backed securities and loans." The report continued: "The reduction in the bank's assets was part of the Bank's continuing efforts to comply with its regulatory capital requirements. As discussed in the section Capital Requirements, the regulatory capital required of the Bank is scheduled to increase over the next three years." While that report is evidence that CalFed was downsizing during that period, at least in part

because of regulatory capital requirements, the report does not support CalFed's contention that it was required to sell the ARMs and that absent the breach it would have retained those assets.

Other documentary evidence on which CalFed relies fails to provide support for CalFed's basic thesis on causation. For example, CalFed's 1990 10-K report stated that CalFed had sold "certain mortgage-backed securities" and that this "reduction of [CalFed's] assets was one of the contributing factors that enabled it to meet the increased regulatory capital requirements of FIRREA." Those statements, however, do not refer to the ARMs and do not suggest that the breach compelled CalFed to sell the ARMs. Moreover, the evidence indicated that the recession and increases in capital requirements that were not related to the breach were responsible for the vast bulk of the deterioration in CalFed's regulatory capital position. Documentary references to the need to sell assets in order to achieve capital compliance therefore do not establish that the breach forced CalFed to sell the ARMs.

The contents of certain other documents, and the absence of documentary support for CalFed's thesis that the breach forced it to sell the ARMs, buttress the trial court's conclusion on causation. For example, the court referred to a lengthy statement made by a CalFed vice-president a year after the breach in an effort to explain to shareholders why CalFed's stock price was dropping. The court found it significant that throughout the lengthy and detailed statement, the CalFed representative made no reference to the sales of ARMs, whether because of the phase-out of supervisory goodwill or otherwise.

Moreover, circulars that were published in 1995 and 1996 when CalFed was seeking to sell shares in this litigation contained detailed accounts of CalFed's theory of recovery. Yet those circulars did not specify the required sale of ARMs as being among the grounds for CalFed's claim of damages, even though the circulars identified other injuries that allegedly flowed from the breach and other specific assets that CalFed had allegedly sold as a result of the breach. More generally, as the trial court noted, there was a paucity of documentary support for CalFed's contention that the breach compelled it to sell the ARMs, even though if CalFed had been forced to sell those assets against its will because of the breach, one would expect to find ample contemporaneous documentary evidence of that fact.

In sum, we conclude that the trial court did not commit clear error in finding that CalFed did not establish that it would have kept ARMs in the absence of the breach and thereby would have made profits that, because of the breach, it was forced to forgo. Because the court reasonably concluded that the documentary evidence in the case did not establish that the breach caused the shrinking of the bank and the sale of the ARMs, and because it was permissible for the court to discount the testimony of the bank's officers in light of the contrary evidence offered by the government, we uphold the trial court's finding that CalFed failed to meet its burden on the issue of causation.

II

We turn next to CalFed's claim that it is entitled to prejudgment interest on the $23 million that it was awarded as the cost of replacing the regulatory capital disallowed as a result of the enactment of FIRREA.

By statute, an award of prejudgment interest "on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims" only if the contract or an Act of Congress "expressly provide for payment thereof."  28 U.S.C. § 2516(a).  This is not an action against a federal agency as such, but is an action against the United States based on a breach of contract caused by the enactment of legislation.  Because the action is based on a claim against the United States and is brought in the Court of Federal Claims, the availability of interest is directly governed by section 2516(a), not by the statutes applicable to suits against individual agencies.  Because neither any of the contracts in suit nor any pertinent statute expressly provides for the payment of interest, the trial court correctly held that interest is not available to CalFed.

This case is not governed by an analogy to the principle that interest is available against the United States in takings cases.  See Library of Congress v. Shaw, 478 U.S. 310, 317 n.5 (1986).  The grant of interest in those cases is regarded as a necessary component of the constitutional imperative of "just compensation" that must be paid pursuant to the Takings Clause of the Constitution to any person whose property has been taken for a public purpose.  Shoshone Tribe of Indians v. United States, 299 U.S. 476, 497 (1937).  In this contract case brought under the Tucker Act against the United States, there is no such constitutional compulsion for the payment of interest, and therefore the statutory "no interest" rule applies.

Even apart from the restraints of 28 U.S.C. § 2516(a), we would find no waiver of sovereign immunity as to FSLIC and the FHLBB for the grant of interest.  Although acknowledging that sovereign immunity generally precludes awards of interest against

federal agencies, CalFed argues that Congress waived sovereign immunity in the case of FSLIC through the "sue and be sued" clause found in FSLIC's organic statute, 12 U.S.C. §§ 1725(a)-(b), 1726(a) (1988). CalFed contends that the Supreme Court's decision in Loeffler v. Frank, 486 U.S. 549 (1988), which held that a "sue and be sued" clause in the Postal Service's organic statute constituted a waiver of sovereign immunity, should apply equally to FSLIC.

We disagree. The Supreme Court in Loeffler focused on the extent to which Congress intended for the Postal Service to function as a commercial, not a governmental entity. By contrast, the FHLBB and FSLIC, like their successors the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, perform distinctly governmental regulatory functions. On that ground the other courts of appeals that have addressed the issue have rejected the argument that a "sue and be sued" clause in the organic statutes of those agencies waives sovereign immunity with respect to the grant of prejudgment interest. See Battista v. Fed. Deposit Ins. Corp., 195 F.3d 1113, 1120 (9th Cir. 1999); Far West Fed. Bank v. Office of Thrift Supervision, 119 F.3d 1358, 1366 (9th Cir. 1997); Resolution Trust Corp. v. Fed. Sav. & Loan Ins. Corp., 25 F.3d 1493, 1506 (10th Cir. 1994); Spawn v. West. Bank—Westheimer, 989 F.2d 830, 835-38 (5th Cir. 1993). We see no reason to part company with the other circuits on this issue.

III

In its cross-appeal, the government seeks to reopen the issue of liability with respect to two of the thrifts that CalFed acquired in the early 1980s—the Brentwood Savings and Loan Association, acquired in 1982, and the Family Savings and Loan

Association, acquired in 1983. CalFed acquired the Brentwood and Family thrifts without the kind of formal acquisition agreement with FSLIC that accompanied many of the thrift acquisitions during the 1980s. The government now argues (1) that there was "no contractual intent, and hence, no contract" resulting from the regulatory approval of the Brentwood and Family acquisitions; and (2) that even if the elements of contract were present, representatives of the FHLBB and FSLIC did not have the statutory authority to enter into contracts having the effect of imposing binding obligations on the United States.

The argument that there was no intent to contract with respect to the two challenged acquisitions was addressed and rejected by this court in the prior appeal in this case. See 245 F.3d at 1346. Based on law of the case principles, we decline to reconsider that issue. We note that the government does not offer any reason that the law of the case doctrine is inapplicable, but simply asserts that "[t]o the extent the law of the case doctrine prevents a re-examination" of our previous ruling on that issue, "the issue will have to await any Supreme Court review."

In the last appeal, we also held that the FHLBB and FSLIC representatives were authorized to enter into the contracts at issue here. With respect to that issue, the government contends that law of the case principles do not apply, because the authority of our prior decision in this case has been undermined by an intervening en banc decision of this court, Schism v. United States, 316 F.3d 1259 (Fed. Cir. 2002).

In Schism, a group of servicemen sued for breach of contract arising from military recruiters' promises that the servicemen would be provided free lifetime medical care for them and their dependents. We held that no statute gave the recruiters authority to

make such promises and that the promises therefore did not give rise to a binding contract between the servicemen and the United States.

The principles of Schism do not apply in this case, because the FHLBB and FSLIC had authority to regulate capital requirements for savings and loan institutions and to enter into agreements with acquirers of insolvent thrifts under which minimum capital requirements would be adjusted on a case-by-case basis. We so held in the prior appeal in this case, 249 F.3d at 1347, and the Supreme Court reached the same conclusion in Winstar, The plurality opinion in Winstar so stated:

> There is no question . . . that the Bank Board and FSLIC had ample statutory authority to do what the Court of Federal Claims and the Federal Circuit found they did do, that is, promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible.

518 U.S. at 890. The plurality opinion further explained that the statutory authority extended "to contracts governing treatment of regulatory capital," and that Congress had specifically acknowledged FSLIC's authority to permit thrifts to count goodwill toward capital requirements when it amended the National Housing Act in 1987. Id. at 890-91. Based on that authority, the plurality opinion concluded that there is "no serious question that FSLIC (and the Bank Board acting through it) was authorized to make the contracts at issue," the substance of which was similar to the contracts at issue in this case. Id. at 891. The three concurring justices agreed with that portion of the plurality's analysis, stating that "the contracts at issue in this case gave rise to an obligation on the part of the Government to afford respondents favorable accounting treatment." Id. at 919 (Scalia, J., concurring in the judgment).

Our decision in Schism is not contrary to the Supreme Court's decision in Winstar, because the two cases involve entirely different statutory schemes. In Schism we addressed the general housekeeping statute that grants the head of every executive and military department the authority to "prescribe regulations for the government of his department, the conduct of his employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." 5 U.S.C. § 301. We held that the general housekeeping statute was not sufficiently specific to authorize military recruiters to make promises regarding the provision of free lifetime medical care. Schism, 316 F.3d at 1279-80. The general housekeeping statute, however, is far less comprehensive and specific than the statutory authorization of the FHLBB and FSLIC. Even as of the time of the Brentwood and Family acquisitions, Congress gave those agencies various forms of regulatory authority over the thrift industry, including the authority to impose capital reserve requirements in a form satisfactory to FSLIC, to dispose of defaulting thrifts as they deem appropriate, and to enter into contracts in support of their regulatory responsibilities. See 12 U.S.C. §§ 1725(c)(3), 1726, 1729(b), (f), 1730a(m) (1982).

Even if we considered the analysis of the military recruiters' contracting authority in Schism to be at odds with the Supreme Court's analysis of the authority of FSLIC and the FHLBB to enter into contracts with acquiring thrifts in which FSLIC or the FHLBB made promises regarding capital maintenance requirements and the amortization of supervisory goodwill, we would not be free to reject the Supreme Court's statutory authority analysis in Winstar in favor of the rationale of our decision in Schism. Accordingly, we reject the government's argument in its cross-appeal that the FHLBB

lacked the authority to enter into the contracts regarding the Brentwood and Family acquisitions.

Each party shall bear its own costs for this appeal.

<u>AFFIRMED.</u>