NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-5161

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ROCHESTER,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

David T. Case, Kirkpatrick & Lockhart Preston Gates Ellis LLP, of Washington, DC, argued for plaintiff-appellee.

Elizabeth M. Hosford, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. On the brief were Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Kenneth M. Dintzer, Assistant Director, and Arlene Pianko Groner, Delisa M. Sanchez, and William G. Kanellis, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Judge George W. Miller

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2007-5161

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ROCHESTER,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 95-CV-517, Judge George W. Miller.

_____

DECIDED: August 13, 2008

_____

Before LINN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and PROST, Circuit Judge.

Opinion for the court filed by Circuit Judge PROST. Opinion dissenting-in-part filed by Senior Circuit Judge FRIEDMAN.

PROST, Circuit Judge.

This is a Winstar-related case arising out of the savings and loan crisis of the 1980s. The government appeals the decision by the United States Court of Federal Claims finding the government liable for breach of contract and awarding damages to First Federal Savings and Loan Association of Rochester ("First Federal"). First Fed. Sav. & Loan Ass'n of Rochester v. United States, 76 Fed. Cl. 106 (2007) ("First Federal II"). We affirm.

I

A

First Federal was a mutual savings and loan association whose accounts were insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). The FSLIC devised the "Phoenix" program to consolidate large insolvent thrifts, appoint good management, and reduce operating costs so that the thrifts could be recapitalized or sold at a lower cost. In September 1981, First Federal became the first thrift placed in the Phoenix program when it agreed to four mergers with severely undercapitalized institutions. After First Federal underwent controlled growth as a Phoenix, the FSLIC began to look for a more permanent solution.

On August 8, 1986, the FSLIC released First Federal from the Phoenix program by executing the Financing Agreement. A key element of the Financing Agreement was the conversion of First Federal from a mutual association to a publicly-held stock association. Under the Financing Agreement, FSLIC forgave $158.5 million in debt owed to it by First Federal and infused $200 million into First Federal. The following sections of the Financing Agreement are relevant to this dispute:

> Section 6.04. Conversion Covenant. First Federal shall use its best efforts in good faith to complete the Common Stock Offering and to consummate the Conversion as soon as practicable, provided that the Board of Directors shall have reasonably determined that it is in the best interests of First Federal to proceed with the Conversion. First Federal shall furnish to the Supervisory Agent a semi-annual report, within 30 days after each June 30 and December 31 commencing December 31, 1986, as to its progress toward making the Common Stock Offering. . . .
> . . .
> Section 6.09. Compliance with Laws. During the term of this Agreement, First Federal will comply with any and all applicable statutes, regulations, or orders of, or any restriction imposed by, the United States of America or any state, municipality, or other political subdivision, or any

agency thereof, relating to the conduct of its business or the ownership of its properties. . . .

Section 6.10. <u>Net Worth of First Federal</u>. <u>The amount of net worth required under 12 C.F.R. § 563.13 (1986) or any successor regulation shall not be required of First Federal</u>. Instead, First Federal will be required to have a net worth/total liabilities ratio, computed in accordance with generally accepted accounting standards, greater than or equal to the following:

| Years After Initial Closing | Minimum Net Worth/ Total Liabilities |
|---|---|
| 1-5 | 1.09 |
| 6-7 | 1.41 |
| 8-10 | 3.56 |

However, if the net worth ratio should at any time fall materially below the required percentages then First Federal shall be in breach of this Agreement. In addition to any other remedies available, FSLIC shall have all the rights granted it under 12 C.F.R. § 563.13 (1986) or any successor regulation.

Section 6.11. <u>Capital Plan of First Federal</u>. First Federal covenants that it will use its best efforts to implement its Capital Plan, as described in Exhibit E attached hereto.

(Emphases added). The Capital Plan, attached to the Financing Agreement as Exhibit E, called for a conversion within eighteen to thirty-six months and characterized a successful conversion as one that would raise approximately $150 million in capital. The Capital Plan also set forth annual earning (net worth) projections prior to and following the expected $150 million stock conversion.

In the fall of 1988, Canada Trust Company ("Canada Trust") raised with First Federal the possibility of a transaction in which First Federal would convert from a mutual to a stock institution and Canada Trust would acquire a majority share of its common stock. First Federal subsequently ended the discussions.

Thereafter, First Federal and Monroe Savings Bank ("Monroe") executed a merger agreement, and First Federal sought approval for the merger. FDIC approved $33 million in assistance for the merger. On November 22, 1998, the Federal Home

Loan Bank of New York ("FHLB-NY") evaluated First Federal's proposed acquisition of Monroe and recommended that the bid be accepted. On March 17, 1989, the Federal Home Loan Bank Board ("FHLBB") also recommended approval of the merger.

On August 9, 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"), which imposed stricter standards for the calculation of the regulatory capital. The FHLBB and the FSLIC were abolished and replaced by the Office of Thrift Supervision ("OTS") and the Federal Deposit Insurance Corporation ("FDIC"), respectively. First Federal II, 76 Fed. Cl. at 110.

On September 14, 1989, the Acting Deputy Director of OTS, recommended to the Director of OTS that the Monroe acquisition be disapproved because the resulting institution would not be in compliance with the tangible capital requirements mandated under FIRREA. After regulatory officials told First Federal that the merger would not be approved First Federal withdrew the Monroe merger application on November 14, 1989. Two years later, First Federal converted from a mutual to a stock association and was acquired by Canada Trust.

B

First Federal sued the government for breach of the Financing Agreement. On October 14, 2003, the Court of Federal Claims granted First Federal's motion for partial summary judgment on liability, holding that the government breached the Financing Agreement by imposing regulatory capital requirements contrary to those specified in Section 6.10. First Fed. Sav. & Loan Ass'n of Rochester v. United States, 58 Fed. Cl. 139, 160, 167 (2003) ("First Federal I"). The court concluded, however, that there was a

genuine issue of material fact as to whether the government's failure to approve the Monroe merger application was a breach of the Financing Agreement. Id. at 163. The court then held a trial on the remaining liability issues and damages.

On April 13, 2007, the court issued an opinion and order holding that the government's breach of Section 6.10 of the Financing Agreement caused First Federal to incur damages in the amount of $96,581 million, including: (1) $26.061 million in lost profits because First Federal had to curtail its growth of profitable assets between 1990 and 1997, (2) $56.137 million because First Federal was prevented from acquiring Monroe, and (3) $14.383 million because First Federal was forced to be acquired by Canada Trust. First Federal II, 76 Fed. Cl. at 112-143, 152. Thereafter, the court adjusted the total damages to $85.459 million—reflecting an $11.122 million offset—and entered judgment against the government. First Fed. Sav. & Loan Ass'n of Rochester v. United States, 76 Fed. Cl. 765, 767 (2007).

The government appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

II

Contract interpretation is a question of law, which we review de novo. St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1380 (Fed. Cir. 2008). In the context of Winstar litigation, whether a breach of contract caused certain damages is a question of fact, which we review for clear error. Fifth Third Bank v. United States, 518 F.3d 1368, 1375 (Fed. Cir. 2008). Similarly, foreseeability and proof of damages to a reasonable certainty are issues of fact. Id. A finding of fact will be overturned only when "the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed." Id. (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).  Whether a breach of contract was material is a mixed question of fact and law.  Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1369 (Fed. Cir. 2005).

## III

The government asserts that the Court of Federal Claims erred: (1) by finding that there was not a prior material breach by First Federal, (2) by finding that the government breached the Financing Agreement by not approving the Monroe merger because First Federal did not meet the regulatory capital requirements under FIRREA, and (3) by not relying on the growth projections in the Capital Plan in calculating lost profits.  We take each argument in turn.

## A

In defending against First Federal's allegation that the government breached Section 6.10 of the Financing Agreement, the government alleged that First Federal committed a prior material breach by not complying with the notice requirements set forth in Section 6.04.  Specifically, the government alleged that First Federal failed to report the overtures made by Canada Trust.  The government contends that the court's analysis improperly conflates two separate requirements in Section 6.04, the conversion requirement and the notice requirement.  According to the government, it is clear from the language of Section 6.04—"progress toward making the Common Stock Offering"— that the notice requirement did not apply only to a standard conversion (i.e., public stock offering) or a depositor offering.  The government notes that Section 1.01.12 defines "Common Stock Offering" to mean "the offering of Common Stock (and possibly

Convertible Securities and/or Public Warrants) which will be made by First Federal when and if the Conversion occurs." Section 1.01.14, in turn, defines "Conversion" to mean "the conversion of First Federal from a federal mutual savings and loan association to a federal stock savings and loan association." In addition, the government asserts that it is clear from the language that First Federal was required not just to give notice of completed transactions, but to give notice of any "progress" toward a transaction.

In support of its argument, the government contends that trial testimony shows that the regulators understood Section 6.04 to require First Federal to give notice of all prospects and developments related to its obligation to convert. Further, the government contends that, with the exception of the Canada Trust overtures, First Federal was diligent in reporting about any alternatives to a standard conversion. Thus, its failure to report the overtures by Canada Trust constituted a breach of Section 6.04. The government avers that the breach by First Federal was "material" because it deprived the regulators of their right to be informed about First Federal's progress toward conversion, and because the FSLIC had a right to purchase up to 25% of First Federal's stock once it converted. Therefore, the government contends that First Federal committed a prior material breach of the Financing Agreement.

A party sued for breach of contract may defend on the ground that the other party committed a prior material breach. Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1251 (Fed. Cir. 2007); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1380 (Fed. Cir. 2004). "Faced with two parties to a contract, each of whom claims breach by the other, courts will often impose liability on the party that committed

the first material breach." Barron Bancshares, 366 F.3d at 1380 (citations and internal quotations omitted). A material breach is one that "relates to a matter of vital importance, or goes to the essence of the contract." Hometown Fin., 409 F.3d at 1370 (quoting Thomas v. HUD, 124 F.3d 1439, 1442 (Fed. Cir. 1997)).

We find no error by the Court of Federal Claims in its interpretation of Section 6.04 of the Financing Agreement. In construing the conversion and notice provisions in Section 6.04, the court looked to the entire clause to understand the provisions in context. The court noted that the first part of Section 6.04 required First Federal to "complete the Common Stock Offering and to consummate the Conversion as soon as practicable, provided that the Board of Directors shall have reasonably determined that it is in the best interests of First Federal to proceed with the Conversion." First Federal II, 76 Fed. Cl. at 149. The court found that the evidence showed that the Board of Directors had determined that pursuing a standard conversion, not a modified conversion, was in the best interests of First Federal because it could maintain its Generally Accepted Accounting Principles ("GAAP") net worth, continue deriving the full benefit of its net operating loss carryforwards ("NOLs"), and ensure that depositors would be able to purchase stock. Id. Thus, a proposed acquisition by another bank was not in the best interests of First Federal, and the overtures by Canada Trust did not contemplate a "common stock offering" as required by Section 6.04. Id. The court further found that the evidence showed that First Federal informed Canada Trust that it was not interested in a modified conversion and immediately cut off conversations. Id. at 149-50. Therefore, the court concluded that the overtures did not constitute

"progress" toward making such an offering. <u>Id.</u> at 150. We find the analysis by the Court of Federal Claims to be sound.

B

The government next argues that the Court of Federal Claims erred in holding that the government breached the Financing Agreement by relying on the more restrictive capital requirements of FIRREA, rather than those set forth in Section 6.10, in failing to approve the Monroe merger application. In particular, the government avers that the court erred in its conclusion that Section 6.10 of the Financing Agreement replaced the usual regulatory standards for the purposes of a merger application. According to the government, the court's construction of Section 6.10 conflicts with Section 6.09. Section 6.09 expressly provided that all FSLIC and FHLBB regulations, except 12 C.F.R. § 563.13, remained applicable. Thus, the government asserts, Section 6.10 applied only to First Federal's obligation to maintain its capital ratio at the percentages applicable in the forbearance, and did not grant a forbearance from regulations relating to mergers and acquisitions. The net worth standards in Section 6.10 and the growth projections in the Capital Plan reflected an understanding by the parties to the Financing Agreement that First Federal would grow internally, not by merging with another thrift. The government contends that the Court of Federal Claims erred by construing Section 6.10 as providing First Federal with cart blanche pre-approval to merge with other institutions. Instead, the government avers, both before and after enactment of FIRREA, the standards for approval of a merger were the same—whether the merging institutions had adequate financial and managerial resources to meet the applicable regulations and laws.

We find no error in the Court of Federal Claims' construction of Section 6.10. The court appreciated that the Financing Agreement was conceived and executed in the context of the regulatory environment existing in 1986, and that, at that time, 12 C.F.R. § 563.13 was the standard for measuring the capital adequacy of a potential merger between two mutual savings associations. First Federal II, 76 Fed. Cl. at 124. Thus, the court reasonably concluded that the parties were aware of the broad applicability of 12 C.F.R. § 563.13. Id. Because Section 6.10 substituted its net worth ratios for those in 12 C.F.R. § 563.13, the court further concluded that the parties understood that no capital requirements other than those of Section 6.10 needed to be satisfied in order to be eligible to merge with another institution. Id. We agree that Section 6.10 should reasonably be construed to apply to First Federal's state of affairs both before and after a merger. As the Court of Federal Claims observed, the other provisions of the Financing Agreement indicated that the agreement was equally applicable to successors of First Federal, and thus that the parties contemplated the possibility of a merger. Id. at 125. The court further noted that the government's own treatment of the Monroe application prior to the enactment of FIRREA demonstrated that it viewed Section 6.10 as the standard by which First Federal's capital adequacy would be measured for purposes of a merger. Id. at 125. Accordingly, we find no error by the court in its determination that Section 6.10 of the Financing Agreement replaced the usual regulatory standards for the purposes of a merger application and that the government breached the Financing Agreement by applying the more onerous capitalization requirements of FIRREA.

The government further contends that the Court of Federal Claims erred in finding that the government's refusal to approve the merger of First Federal and Monroe, not First Federal's voluntary withdrawal of its application, is what caused the merger to fail. The government avers that First Federal withdrew its application before the regulators acted upon it because First Federal was experiencing income losses and deposit outflows. Thus, the government asserts that First Federal is not entitled to lost profits based on the failure of the Monroe merger.

In order to be entitled to expectancy damages, including lost profits, three requirements must be satisfied: (1) the loss must be foreseeable; (2) the breach must have caused the plaintiff's failure to earn the lost profits; and (3) the measure of damages must be reasonably certain. Cal. Fed. Bank v. United States, 395 F.3d 1263, 1267 (Fed. Cir. 2005). In determining whether the government's breach of the Financing Agreement caused the failure of the Monroe merger, the court correctly recognized that the government's breach need not be the "but-for cause" of the demise of the merger. Although this court has rejected the "substantial factor" test in establishing a causal connection between a contract breach and lost profits, we have held that the breach need not be "the sole factor or sole cause in the loss of profits." Id. at 1268. However, since lost profits are a measurement of what a party would have received in the absence of the breach, a preponderance of the evidence must show that the "profits would have been made but for the breach." Id.

The Court of Federal Claims determined that the government's breach was both a substantial factor and the but-for cause preventing the merger. First Federal II, 76 Fed. Cl. at 129. The court found that First Federal had been interested in a merger with

Monroe since 1987 because a merger offered the prospect of branch consolidation, immediate asset growth, and the second-highest market share in Rochester, and that both the FHLB-NY and the FDIC indicated a willingness to approve the merger. Id. at 127. After enactment of FIRREA, however, the regulatory authorities recommended against approving the Monroe merger application because First Federal did not meet the tangible capital requirements of FIRREA. Id. at 129. The court found that the evidence showed that First Federal withdrew its application because it was going to be rejected based on FIRREA's capitalization requirements. Id. at 130. We find no clear error by the court in its factual determinations. Accordingly, we agree that the government breached the Financing Agreement by imposing the more onerous capital requirements in FIRREA, and that the failure of the Monroe merger would not have occurred but for the government's breach.

C

Finally, the government contends that the lost profits awarded by the Court of Federal Claims were excessive because they were based on an assumption that, at the time of the Financing Agreement, it was foreseeable to the government that First Federal would grow at an annual rate of more than 13% beginning in 1989. The government asserts that the court erred by setting aside the growth projections in the Financing Agreement itself and substituting growth projections that were more than four times greater, and that were made either before or after contract formation. According to the government, the Capital Plan contained projections of annual asset growth between approximately 3.25% and 3.50%, and serves as the best evidence of the expectations of First Federal and the regulators at the time the Financing Agreement

was executed; yet, the court relied on evidence of expected growth created either during First Federal's Phoenix phase before the Financing Agreement, or well after contract performance had commenced. Moreover, the government asserts, the court applied the wrong foreseeability standard by not requiring that both the type and magnitude of damages be foreseeable at the time of contracting.

In order to be entitled to lost profits, the plaintiff must establish that the damages were foreseeable to the breaching party at the time of contract formation. Old Stone Corp. v. United States, 450 F.3d 1360, 1375 (Fed. Cir. 2006). "[T]hat some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Id. at 1376 (emphasis added) (quoting Restatement (Second) of Contracts § 351 cmt a. (1981)). While it is true that "a plaintiff must prove that both the magnitude and type of damages were foreseeable," Landmark Land Co. v. FDIC, 256 F.3d 1365, 1378 (Fed. Cir. 2001), the plaintiff need only prove the amount of damages with reasonable certainty. Cal. Fed. Bank, 395 F.3d at 1267. Indeed, as long as "a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." Id.

The Court of Federal Claims went through a lengthy analysis of the evidence presented by First Federal regarding the additional assets—and earnings on those assets—which it would have realized in the absence of the government's breach of the Financing Agreement. Crediting the testimony of First Federal's expert witness, Dr. Donald Kaplan, and its former chief financial officer, Mr. Mark Chaplin, the court found that, but for the breach, First Federal would have added approximately $400 million in profitable assets by the end of 1989. First Federal II, 76 Fed. Cl. at 116-19. It further

found that First Federal would have earned profits of approximately $26.061 million on those foregone assets between 1990 and 1997. Id. at 122. In considering whether the government had a reason to foresee lost profits as a result of its breach of Section 6.10, the court concluded that it was foreseeable that requiring First Federal to comply with FIRREA's stricter capital standards would cause First Federal to curtail growth and lose profits. Id. We agree. The government's argument that the court erred by not relying on the asset growth rate projections in the Capital Plan is unpersuasive. As the court determined, the growth projections set forth in the Capital Plan were not limitations on growth. Moreover, First Federal's primary business strategy had long been to increase its assets, even during its years as a Phoenix. Thus, the court properly concluded that the government should have reasonably foreseen that First Federal might significantly exceed those projections. We find no error by the Court of Federal Claims in its award of lost profits.

IV

For the foregoing reasons, we affirm the Court of Federal Claims' holding that the government breached the Financing Agreement by not approving the Monroe merger because First Federal did not meet the regulatory capital requirements under FIRREA, and its holding that First Federal did not commit a prior material breach by not reporting the overtures by Canada Trust. We further affirm the court's award of lost profits.

# United States Court of Appeals for the Federal Circuit

2007-5161

FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ROCHESTER,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims in 95-CV-517, Judge George W. Miller.

FRIEDMAN, <u>Senior Circuit Judge</u>, dissenting in part.

I agree with the court that First Federal did not breach the Financing Agreement by failing to inform the government about Canada Trust's proposal that it acquire First Federal.  I also agree that the Court of Federal Claims properly concluded that First Federal's lost profits were foreseeable when the Financing Agreement was executed.  Where I part company from the court is its holding that the government breached the Financing Agreement by failing to approve First Federal's proposed acquisition of Monroe Savings Bank.

The court's reasoning on the Monroe issue is as follows:  In section 6.10 of the Financing Agreement, the parties agreed that the net worth ratios there stated (lower than those in the governing regulation) would be the only ones First Federal would have to satisfy.  The government breached this commitment by refusing to approve the

Monroe acquisition because the merged institution would not meet the higher capital ratios required under the recently enacted FIRREA.

Section 6.10, however, deals only with First Federal's net worth. It does not deal with the standards the regulators would apply in evaluating First Federal's proposed acquisition of another banking institution. Nothing in the Financing Agreement explicitly deals with government approval of mergers or acquisitions, or purports to specify the standard's the government would apply in performing that function. It does not follow that because First Federal generally would have to meet only those lower capital ratios, the government could not require that a merger of First Federal would result in the new higher capital ratios that FIRREA required. Before I could conclude that the Financing Agreement imposed such a significant limitation on the government's broad regulatory authority over savings-and-loan mergers and acquisitions, I would require a far stronger showing that the parties so intended than I can discern in the Financing Agreement.