**SCOTT TIMBER COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 94–784C, 96–204C.**

United States Court of Federal Claims.

Feb. 8, 2005.

Alan I. Saltman, Saltman & Stevens, P.C., Washington, D.C., for plaintiff. Ruth G. Tiger, Richard W. Goeken, Saltman & Stevens, P.C., Washington, D.C., of counsel.

John S. Groat, Trial Attorney, Kathryn A. Bleecker, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Laurie Ristino, U.S. Department of Agriculture, Washington, D.C., of counsel.

### OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on defendant's Motion for Summary Judgment as to Damages in Case No. 94–784C, and plaintiff's Motion for Summary Judgment as to Liability on Counts II and III of the Amended Complaint and defendant's Cross–Motion for Summary Judgment as to Damages in Case No. 96–204C. After defendant filed its motion in Case No. 94–784C, plaintiff filed an opposition, to which defendant filed a reply. Plaintiff filed a surreply to defendant's reply. Following oral argument, defendant filed a Notice of Supplemental Authority, which plaintiff opposed. The Court, in ruling on defendant's Motion for Summary Judgment, has considered the authorities cited in defendant's Notice of Supplemental Authority and plaintiff's opposition thereto.

After plaintiff filed a Motion for Summary Judgment as to Liability on Counts II and III of the Amended Complaint in Case No. 96–204C, defendant filed its opposition and a Cross–Motion for Summary Judgment as to Damages, to which plaintiff filed a reply and opposition. Defendant thereafter filed a reply in support of its Cross–Motion for Summary Judgment. Plaintiff later filed by leave of court a surreply to defendant's Cross–Motion, and defendant filed by leave of court a sur-surreply in response to plaintiff's surreply.

Recently both of the parties filed notices of supplemental authority, citing the decision of the Court of Appeals for the Federal Circuit in *Cal. Fed. Bank v. United States*, 395 F.3d 1263 (Fed.Cir.2005). The Court has considered the Federal Circuit's opinion in resolving the parties' motions for summary judgment.

For the reasons set forth below, plaintiff's Motion for Summary Judgment as to Liability on Counts II and III of the Amended Complaint in Case No. 96–204C is GRANTED; defendant's Motion for Summary Judgment as to Damages in Case No. 94–784C is GRANTED in part and DENIED in part; and defendant's Cross–Motion for Summary Judgment as to Damages in Case No. 96–204C is GRANTED in part and DENIED in part.

### BACKGROUND

On January 12, 1988, the National Audubon Society and thirty-two of its chapters in Washington, Oregon, and California filed a petition with the United States Fish and Wildlife Service ("FWS") requesting a listing of the marbled murrelet as a "threatened species" under the Endangered Species Act ("ESA"), 16 U.S.C. 1531 *et seq.* On January 6, 1989, FWS proposed that a listing of the murrelet "as endangered or threatened is possibly appropriate." 54 Fed.Reg. 554 (Jan. 6, 1989). This notice also "encouraged Federal agencies and other appropriate parties to take [the murrelet] into account in environmental planning." *Id.* The United States

Forest Service ("Forest Service") listed the murrelet as a "sensitive species" within Oregon and Washington in March 1989. *Scott Timber v. United States,* 40 Fed.Cl. 492, 495 (1998) ("*Scott I*").

In 1990, the Forest Service solicited competitive bids for the sale and harvest of timber in the Siskiyou and Siuslaw National Forests in Oregon under section 318 of the Department of the Interior Appropriations Act of 1990, Pub.L. No. 101–121, 103 Stat. 701 (1989) ("section 318"). Section 318, also known as the Northwest Timber Compromise, mandated that the "Forest Service shall offer … an aggregate timber sale level of seven billion seven hundred million board feet of net merchantable timber from the national forests of Oregon and Washington for fiscal years 1989 and 1990." Pub.L. No. 101–121, 103 Stat. at 745–50. This provision responded to a timber shortage in the Pacific Northwest resulting from competing interests of environmentalists and the timber industry. *See Scott Timber v. United States,* 44 Fed.Cl. 170, 175 (1999) ("*Scott II*") (citing *Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992)). Plaintiff, Scott Timber Company ("Scott"), won eleven such timber sale contracts. The Forest Service awarded the contracts to Scott between April 9, 1990 and October 16, 1990.

The Forest Service's compliance with section 318 satisfied its obligations under the National Forest Management Act of 1976 ("NFMA") and the National Environment Policy Act of 1969 ("NEPA") to provide protection for sensitive species in offering timber sales contracts. *Scott II,* 44 Fed.Cl. at 175–79.

In April 1991, the Audubon Society filed suit to compel FWS to list the murrelet as a threatened or endangered species under the ESA. *See Marbled Murrelet v. Lujan,* No. C91–522 (W.D.Wash. Apr. 17, 1991) ("the listing action"). The plaintiffs in the listing action added the Forest Service as a defendant in September 1992, seeking to require the Forest Service to maintain a viable population of marbled murrelets under the NFMA. The district court in the listing action issued a temporary restraining order ("TRO") on September 16, 1992, to prohibit "the logging of any marbled murrelet habitat." *Id.* The restraining order was set to expire by its own terms on September 26, 1992. *Scott I,* 40 Fed.Cl. at 496.

On September 17, 1992, the Forest Service orally informed Scott that it was suspending operations under the section 318 contracts. Though the TRO was set to expire by September 26, the Forest Service informed the district court that it would continue the suspension of logging operations until FWS made a final decision on listing the murrelet. Consistent with that representation, the Forest Service notified Scott that the suspensions would remain in effect indefinitely. By order of the district court, FWS listed the murrelet as a threatened species, effective September 28, 1992. *See* 57 Fed.Reg. 45,328 (Oct. 1, 1992).

Section 7 of the ESA and its implementing regulations require every federal agency to participate in a detailed consultation process to determine what impact, if any, that agency's operations will have on any newly listed species. *See* 16 U.S.C. § 1536(a)(2), (b) (2000); 50 C.F.R. pt. 402 (2004). Accordingly, on October 1, 1992, the Forest Service initiated a formal consultation with FWS to analyze the impact of the timber sales contracts in the Siskiyou and Siuslaw National Forests. *Scott I,* 40 Fed.Cl. at 496. FWS did not accept the Forest Service's October 1 submission because it did not contain all the required information under section 7. By letter dated October 19, 1992, Scott informed the Forest Service that it intended to participate in the consultation as an "applicant" under the ESA, specifically 16 U.S.C. § 1536(a)(3). *Scott Timber Company v. United States,* 333 F.3d 1358, 1361 (Fed.Cir. 2003) ("*Scott IV*"). The Forest Service notified Scott on November 13, 1992, that Scott was entitled to participate in the consultation process. On December 3, 1992, the Forest Service forwarded additional information to FWS, and FWS accepted the Forest Service's submission on December 8, 1992, thus beginning the formal consultation. The ESA requires completion of the formal consultation within 90 days with a potential for extension up to 150 days upon written notice. 16

U.S.C. § 1536(b). The consultation may extend beyond 150 days only with the applicant's consent. *Id.*

FWS issued a draft biological opinion on July 20, 1993, which the Forest Service reviewed. After considering the Forest Service's comments on the draft biological opinion, FWS issued a second draft biological opinion on September 1, 1993. The second draft biological opinion concluded that the section 318 contracts jeopardized the murrelet. Further, the opinion foresaw no reasonable or prudent alternatives to terminating the contracts in murrelet habitat.

Scott attended two applicant meetings on the draft biological opinion in September and October 1993. On October 20, 1993, the Siuslaw Timber Operations Association, including Scott, submitted comments disagreeing with the finding of jeopardy and the lack of reasonable and prudent alternatives to the termination of the section 318 contracts. In a letter to the Forest Service dated November 12, 1993, Scott expressed its preference for continued consultations rather than cancellation of the section 318 contracts. Scott further proposed "reasonable and prudent measures/alternatives" to permit operations under the section 318 contracts without harming the murrelet's habitat. *Scott IV,* 333 F.3d at 1362.

On May 11, 1994, FWS issued its final biological opinion, which effectively prohibited timber harvesting on all eleven of Scott's section 318 contracts. The final biological opinion found no reasonable and prudent alternatives to canceling timber sales in any areas of marbled murrelet habitat. Eventually, surveys found murrelet habitat in each of Scott's eleven section 318 contracts. *Scott IV,* 333 F.3d at 1362.

In an attempt to reconfigure the timber contracts to permit some harvesting without disturbing the murrelet, the Forest Service sought technical assistance from FWS through the latter part of 1994 and the early

part of 1995. On March 24, 1995, FWS reinitiated consultation. Def.App. at 123. FWS issued an amended final biological opinion on June 12, 1995. Def.App. at 143–a. This amended biological opinion did not permit any operations under the section 318 contracts at issue in these cases. *Scott IV,* 333 F.3d at 1362. The Forest Service designated critical habitat for the marbled murrelet on May 24, 1996. 61 Fed.Reg. 26,256 (May 24, 1996).

On June 23, 1994, Scott submitted formal claims to the contracting officer ("CO") under the Contract Disputes Act. Scott alleged that the Forest Service's prolonged suspensions of the section 318 contracts constituted a breach of contract. Scott contended that the Forest Service lacked authority to suspend operations under the section 318 contracts for an indefinite and extended period of time. Scott sought damages equal to the cost of obtaining replacement timber in the open market. The CO denied all of Scott's breach of contract claims. Scott began filing breach of contract actions for each of the section 318 contracts in the Court of Federal Claims on October 27, 1994. Those individual actions were consolidated into Case No. 94–784C. On April 17, 1996, plaintiff filed a complaint in the Court of Federal Claims for three additional timber sale contracts, Case No. 96–204C. Case No. 96–204C was consolidated with Case No. 94–784C by Order of June 10, 1996. Later, by agreement of the parties with the court's approval, Case No. 96–204C was held in abeyance pending the final resolution of the issue of liability in Case No. 94–784C. Pl. Mot. for Summ. J. at 1.

The litigation in this case has focused on contract clauses C6.01, C6.25, and C8.21.[1]

Clause C6.01 reads:

C6.01—INTERRUPTION OR DELAY OF OPERATIONS. (6/90) Purchaser agrees to interrupt or delay operations

---

1. Of the 14 section 318 contracts involved in these consolidated cases, seven contain clause C6.01: Cat Track (No. 074188); Raspberry (No. 074121); Formader 103 (No. 085068); Maria Skyline (No. 085209); Skywalker (No. 085118); Wapiti 305 (No. 083428); and Fivemile Flume (No. 085258) (the "C6.01 contracts"). The remaining seven contracts contain clauses C6.25 and B8.21, but do not contain clause C6.01: Toastberry (No. 073842); Father Oak (No. 073784); Beamer 712 (No. 085001); Formader 717 (No. 083410); Indian Hook (No. 085126); Berry Bushel (No. 084962); and Sulphur (No. 084970) (the "non-C6.01 contracts").

under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3 or termination pursuant to C8.2;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (1) Contract Term Adjustment pursuant to B8.21, or (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser. Clause C6.25 reads:

C6.25 # —PROTECTION OF HABITAT OR ENDANGERED, THREATENED, AND SENSITIVE SPECIES. (9/89) Location of areas needing special measures for protection of plants or animals listed as threatened or endangered ... or as sensitive ... are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:

[none are listed in Scott's contracts]

\* \* \* \* \* \*

If protection measures prove inadequate, if other such areas are discovered, or if new species are listed as Federally threatened or endangered or as sensitive by the Regional Forester, Forest Service may either cancel the contract under C8.2 or unilaterally modify this contract to provide additional protection regardless of when such

facts become known. In the event of modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification.... Amount of reimbursement ... shall be in the form of a reduction in Current Contract Rates unless agreed otherwise in writing.

Finally, clause B8.21 reads:

B8.21 Contract Term Adjustment. "Contract Term Adjustment" means adjustment only as provided immediately above and for the three circumstances described in this Subsection. Under said circumstances, the contract term shall be adjusted in writing to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost, except as limited by (b) below.

\* \* \* \* \* \*

[One of the] three circumstances qualifying for a Contract Term Adjustment [is]:

(a) Purchaser experiences delay in starting scheduled operations or interruption in active operations either of which stops removal of Included Timber from Sale Area ... for 10 or more consecutive calendar days during a Normal Operating Season due to causes beyond the Purchaser's control, including but not limited to acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods.

The Court of Appeals for the Federal Circuit held in *Scott IV* that, though the Forest Service was expressly authorized by contract clause C6.01 to suspend operations under the contracts, it was authorized by neither clause C6.25 nor clause B8.21 to do the same. Therefore, the Forest Service was liable for breach of the non-C6.01 contracts. *Scott IV*, 333 F.3d at 1368 ("[T]he Forest Service breached the non-C6.01 contracts when it unilaterally suspended operations."). In so construing C6.25, the Federal Circuit reversed the decision of the trial court in *Scott I*, 40 Fed.Cl. at 502–03. The Federal Circuit also held that "[w]hether the suspensions in this case were reasonable, with respect to the C6.01 contracts, is a triable issue of fact to be adjudicated on remand." *Scott IV*, 333 F.3d at 1370. This reversed the decision by the trial court in *Scott II*, 44 Fed.Cl. at 181.

The Federal Circuit remanded Case No. 94–784C to this court to address two issues: "(1) the amount of damages Scott is entitled to for the Forest Service's breach of the non-C6.01 contracts, and (2) whether the suspensions of the C6.01 contracts were reasonable, and if not, what damages Scott is entitled to due to the unreasonable delay." *Scott IV*, 333 F.3d at 1372.

In light of the Federal Circuit's decision in *Scott IV* holding that the Forest Service had breached contracts that did not contain Clause C6.01, the non-C6.01 contracts, the parties filed motions for summary judgment in Case Nos. 94–784C and 96–204C. In Case No. 94–784C, the Government moved for summary judgment as to breach damages on all of Scott's timber sale contracts or, in the alternative, summary judgment as to breach damages on Scott's non-C6.01 timber sale contracts. Def. Mot. for Summ. J. at 1.

Scott filed a motion for summary judgment on liability for breach of the non-C6.01 contracts in Case No. 96–204C. Scott contended that "the facts, relevant contract terms, and circumstances surrounding the Forest Service's suspension of the Berry Bushel and Sulphur contracts are identical to the facts, relevant contract terms, and circumstances surrounding the Forest Service's suspension of the non-C6.01 contracts at issue in Case No. 94–784C." Pl. Mot. for Summ. J. at 2. The Government filed a cross-motion for summary judgment as to damages, asserting the same arguments that it asserted in its motion for summary judgment in Case No. 94–784C. The Government agreed that "for the purpose of the court's consideration of the issues raised in Scott's motion for summary judgment and the Government's cross-motion," the facts, relevant contract terms, and circumstances surrounding the Berry Bushel and Sulphur contracts were the same as the non-C6.01 contracts in Case No. 94–784C. Def Cross–Mot. for Summ. J. and Opp'n at 3.

## DISCUSSION

### I. Standard of Review on Motions for Summary Judgment

Under Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"), a party will prevail on a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When making a summary judgment determination, a court must consider the existence of a genuine issue as to any material fact." *Nicholson v. United States*, 29 Fed.Cl. 180, 186 (1993) (citing *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548). " 'An issue is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant, while the materiality of the fact is determined by reference to applicable legal standards.' " *Id.* (quoting *Webster Univ. v. United States*, 20 Cl.Ct. 429, 432 (1990) (citing *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562, 1567 (Fed.Cir.1987))).

> If both parties move for summary judgment and allege an absence of genuine issues of material fact "the court is not relieved of its responsibility to determine the appropriateness of summary disposition." Rather, the court evaluates each motion on its own merits, applying the same standard for summary judgment to each motion. Simply because each party asserts a contradictory claim, it does not follow that "if one is rejected the other necessarily is justified."

*Gen. Elec. Co. v. United States*, 60 Fed.Cl. 782, 789 (2004) (quoting *J. Cooper & Assocs., Inc. v. United States*, 53 Fed.Cl. 8, 15 (2002)).

### II. Scott's Motion for Summary Judgment as to Liability in Case No. 96–204C

Scott bases its Motion for Summary Judgment as to Liability for breach of the non-C6.01 contracts in Case No. 96–204C on the fact that the Federal Circuit already held that the Forest Service was liable for breaching the non-C6.01 contracts in Case No. 94–

784C. *Scott IV,* 333 F.3d at 1368. Scott contends that "the facts, relevant contract terms, and circumstances surrounding the Forest Service's suspension of the Berry Bushel and Sulphur contracts are identical to the facts, relevant contract terms, and circumstances surrounding the Forest Service's suspension of the non-C6.01 contracts at issue in Case No. 94–784C." Pl. Mot. for Summ. J. at 2. Therefore, Scott reasons, the Court should hold that the Forest Service breached the non–6.01C contracts in Case No. 96–204C.

In its opposition to Scott's Motion for Summary Judgment as to Liability and its Cross-Motion for Summary Judgment as to Damages in Case No. 96–204C, the Government agrees that "for the purpose of the court's consideration of the issues raised in Scott's motion for summary judgment and the Government's cross-motion," the facts, relevant contract terms, and circumstances surrounding the Berry Bushel and Sulphur contracts were the same as the non-C6.01 contracts in Case No. 94–784C. Def. Cross–Mot. for Summ. J. and Opp'n at 3. The Government argues, however, that because Scott in its motion has not brought forth "some evidence of damage to support a finding on liability," *Cosmo Constr. Co. v. United States,* 196 Ct. Cl. 463, 469, 451 F.2d 602, 606 (1971), Scott is not entitled to entry of summary judgment on the question of liability.

Scott, however, when it alleged that the facts, circumstances, and contract terms in the consolidated cases are identical, implicitly referenced the declarations presented to the Court in support of its liability arguments in Case No. 94–784C. The Government has agreed that the facts, circumstances, and contract terms in the cases are identical.

Therefore, because the Federal Circuit has already held that the Forest Service breached the non-C6.01 contracts, *Scott IV,* 333 F.3d at 1368, and there are no genuine issues of material fact, *Celotex v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548, Scott is entitled to summary judgment as to liability as a matter of law. Scott's Motion for Summary Judgment as to Liability on Counts II (relating to the Berry Bushel timber sale contract) and III (relating to the Sulphur timber sale con-

tract) of the Amended Complaint in Case No. 96–204C is granted.

## III. Scott's Burden of Establishing that the Breach Caused Its Damages

The Government argues that, as a matter of law, Scott has no claim for breach damages based on the Forest Service's suspension of the timber sale contracts because Scott cannot prove that the breach caused its damages. Instead, the Government argues, certain provisions of the ESA, which barred Scott from harvesting timber for certain periods of time during the contract suspension, caused Scott's damages. Def. Mot. for Summ. J. at 23.

■ The Federal Circuit has recently clarified the burden that plaintiffs must bear in establishing a claim for contract damages. *See Cal. Fed. Bank v. United States,* 395 F.3d 1263, 1267 (Fed.Cir.2005). "Contract remedies are designed to make the non-breaching party whole. One way to achieve that end is to give the nonbreaching party 'expectancy damages,' *i.e.,* the benefits the nonbreaching party expected to receive in the absence of a breach." *Id.* (citing *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1379 (Fed.Cir.2001) (citing Restatement (Second) of Contracts § 344(a) (1981))).

In order to be entitled to expectancy damages, which include lost profits, the plaintiff must satisfy three requirements. First, the plaintiff must show that the lost profits were within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting. *La Van v. United States,* 382 F.3d 1340, 1351 (Fed.Cir.2004); *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1325 (Fed.Cir.2002), citing Restatement (Second) of Contracts § 351(1) (1981). Second, the plaintiff must establish that there would have been a profit *but for the breach. Rumsfeld v. Applied Cos.,* 325 F.3d 1328, 1339 (Fed.Cir.2003). Third, the measure of damages must be reasonably certain, although if "a reasonable probability of damage can be clearly established, uncertainty as to the amount will

not preclude recovery." *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308, 1313 (Fed.Cir.2004), quoting *Locke v. United States*, 151 Ct.Cl. 262, 283 F.2d 521, 524 (Ct.Cl.1960).

*Id.* at 1267 (emphasis added).

That is not to say that the breach must be the sole factor or sole cause in the loss of profits. The existence of other factors operating *in confluence with the breach* will not necessarily preclude recovery based on the breach. *See, e.g.,* E. ALLAN FARNSWORTH, CONTRACTS § 12.1, at 150–51 (3d ed.2004). However, lost profits are "a measurement of what a party would have received absent the breaching party's action," *Cienega Gardens v. United States*, 331 F.3d 1319, 1341 (Fed.Cir.2003), *i.e.,* those losses that would not have occurred but for the breach, *see San Carlos Irrigation & Drainage Dist.*, 111 F.3d at 1563. The inability to prove by a preponderance of the evidence that profits would have been made but for the breach will therefore preclude recovery on a lost profits theory.

*Id.* at 1268 (emphasis added).[2]

## IV. Activities Barred by Section 7 of the Endangered Species Act

■ FWS listed the murrelet as a threatened species under the ESA effective as of September 28, 1992. *Scott IV*, 333 F.3d at 1361. Upon the listing of the murrelet, section 7(a)(2) of the ESA required the Forest Service to insure that none of its actions jeopardized the continued existence of the species. 16 U.S.C. § 1536(a)(2). At about the time of the listing, the Forest Service determined that the subject timber sales may affect the marbled murrelet. Def.App. at 5, 7, 13. Once it made that determination, the Forest Service was required to complete formal consultation with FWS on the timber sales before allowing the harvesting of timber on those sales. 50 C.F.R. §§ 402.01, 402.02, 402.14(a). In a September 29, 1992 letter, the Acting Deputy Regional Forester directed that no falling of trees occur on sales containing murrelet habitat. Def.App. at 3; Pl. Opp'n at 7.

Section 7(d) of the ESA mandates that "[a]fter initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant[3] shall not make any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative to the proposed agency action." 16 U.S.C. § 1536(d); *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987). A timber sale is a *per se* irreversible and irretrievable commit-

---

**2.** The Federal Circuit's opinion in *California Federal* set forth a "but for" standard of causation that plaintiffs must satisfy in order to claim breach damages. *Cal. Fed. Bank*, 395 F.3d 1263, 1268 ("[T]he plaintiff must establish that there would have been a profit but for the breach."). The standard as set forth by the Federal Circuit, however, is consistent with the "substantial factor" standard that Scott advocates, *see* Pl. Opp'n at 21, and upon which this Court based its decision in *Precision Pine & Timber Inc. v. United States*, 63 Fed.Cl. 122, 128 (2004) ("A breach is a 'substantial factor' causing the lost profits if it directly and primarily caused the injuries. . . . Plaintiffs must first show that defendant's breach produced damage 'inevitably and naturally, not possibly or probably.' . . . 'If the profits are such as would have accrued and grown out of the contract itself, as a direct and immediate result of its fulfillment, then they would form a just and proper item of damages, to be recovered against the delinquent party upon a breach of the agreement.'" (citations omitted)). The standards are consistent because the Federal Circuit has clarified that, though the plaintiff must establish that

it would not have suffered damages but for the breach, the breach need not "be the sole factor or sole cause in the loss of profits. The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Cal. Fed. Bank*, 395 F.3d 1263, 1268. This is the same approach that Scott advocated, Pl. Opp'n at 21, and that this Court has employed. *See Precision Pine*, 63 Fed. Cl. at 128 ("In order to establish that losses were 'proximately caused' by defendant's breach, plaintiff need not show that defendant's conduct was the 'sole' cause of its damages. . . . . plaintiff 'need not show that each dollar claimed was entirely unaffected by outside events.' " (citations omitted)).

**3.** An "applicant" is defined as a person who requires formal approval or authorization from a government agency as a prerequisite to conducting activity on federal land. 50 C.F.R. § 402.02. An "applicant" is entitled to limited participation in the consultation process. *Id.* at § 402.14. The Forest Service granted Scott applicant status on November 13, 1992.

ment of resources under ESA section 7(d). *Pac. Rivers Council v. Thomas,* 30 F.3d 1050, 1057 (9th Cir.1994), *cert. denied,* 514 U.S. 1082, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995) (citing *Lane County Audubon Soc'y v. Jamison,* 958 F.2d 290, 295 (1992)); *see Sierra Club v. Babbitt,* 65 F.3d 1502, 1508 (9th Cir.1995). Because Scott was an applicant under the ESA during the period of consultation, Scott was barred from harvesting timber by section 7(d). Therefore, Scott would have been unable to harvest timber even if the Forest Service had not breached the timber sale contracts.

Scott argues that section 7(a)(2) is irrelevant to its damages because it barred activities by the Forest Service, not Scott. "[S]ection 7(a)(2) prohibited the Forest Service from authorizing, funding, or carrying out any activity that may affect the species from the time of the listing until it completed consultation with FWS." Pl. Opp'n at 12.

> Scott points out that:
>
> Neither the statute nor the regulation specified the precise manner in which the Forest Service was to comply with the section 7(a)(2) prohibition against its proceeding with its timber sale contract obligations. In this regard, rather than attempting to work out a mutual modification or termination with appropriate compensation with Scott as it might have done, the Forest Service instead unilaterally continued its September 17, 1992 suspension of Scott's operations on the sales indefinitely and continued to deny Scott access to the sale areas.

Pl. Opp'n at 12–13. Scott's section 7(a)(2) argument is misplaced because it focuses on *liability* for the breach of the timber sale contracts, not the *damages caused by the breach.* The Federal Circuit has already held that the Forest Service was liable for breaching the non-C6.01 contracts. *Scott IV,* 333 F.3d at 1368. The fact remains that ESA section 7(a)(2) required the Forest Service to stop all activity on its timber sale contracts. After the Forest Service began its consultation with FWS on December 8, 1992, section 7(a)(2) precluded harvesting, without regard to whether the contracts had been suspended. Because the damage would

have occurred whether or not there was a breach, Scott has, to that extent, failed to establish that the breach was a "but for" cause of the damage.

Next, Scott argues that because the Forest Service suspended its contracts before beginning consultation with FWS, Scott was not subject to the section 7(d) prohibition against "any irreversible or irretrievable commitment of resources." 16 U.S.C. § 1536(d). Scott contends that:

> The only right that Scott ever had to access and cut the timber was contractual. Once the Forest Service took that contractual right away, as it did when its contracting officers suspended all sale operations, Scott no longer had the right to access the timber, let alone a right to cut and remove it. Scott's "applicant" status did not change these facts. Indeed by the time the Forest Service initiated consultation with FWS on December 8, 1992, Scott's operations had already long since been suspended by the Forest Service. Therefore, as of December 8, 1992, Scott had no ability whatever to make any irreversible or irretrievable commitment of the Forest Service's timber resources during the consultation, let alone a commitment that had the effect of foreclosing the formulation of implementation of reasonable and prudent alternatives to the agency action as prohibited by section 7(d).

Pl. Opp'n at 15–16. Scott is mistaken. Once the Forest Service initiated consultation with FWS, even if Scott had maintained a contractual right to access the timber, Scott would still have been barred by section 7(d) from making "any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative to the proposed agency action." 16 U.S.C. § 1536(d); *see Pac. Rivers Council,* 30 F.3d at 1057 ("As the ESA's plain language makes clear, [section] 7(d) applies ... after an agency has initiated consultation under section 7(a)(2).").

Scott points out that though a plaintiff must establish that there would have been a profit but for the other party's breach of contract, the breach need not "be the *sole*

*factor or sole cause* in the loss of profits. The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *See Cal. Fed. Bank,* 395 F.3d 1263, 1268 (emphasis added). The consultation between the Forest Service and FWS, however, was not merely another "factor operating in confluence with the breach" of Scott's timber sales contracts. *See id.* Once the consultation started, section 7 of the ESA became the sole cause of Scott's damages.

Scott further contends that it is wrong to interpret ESA section 7(d) as prohibiting harvesting during a section 7(a)(2) consultation. This "interpretation of section 7(d) would render it redundant of rather than complementary to section 7(a)(2)." Pl. Opp'n at 18. "As viewed by the Government," Scott reasons, " section 7(d) would prohibit the agency from proceeding with the timber sales during the period of consultation with FWS, something which the agency was already directly precluded from doing by section 7(a)(2) as soon as it determined that proceeding with the sales may affect a listed species." *Id.*

Again, Scott is mistaken. Section 7(d) is not redundant of section 7(a)(2). Instead, "section 7(d) clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process." *Conner v. Burford,* 848 F.2d 1441, 1455 n. 4 (9th Cir.1988), *cert. denied,* 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). By keeping both federal agencies and applicants from irreversibly and irretrievably committing resources to an activity that is the subject of a consultation, section 7(d) prevents them from " 'steamrolling' activity in order to secure completion of projects regardless of their impact on endangered species." *N. Slope Borough v. Andrus,* 486 F.Supp. 332, 356 (D.D.C.1980).

As a matter of law, therefore, Scott cannot prove that its damages were caused by the breach of its non-C6.01 contracts, or the alleged breach of its C6.01 contracts, during the periods when the Forest Service was consulting with FWS in accordance with ESA section 7. That period extended from December 8, 1992, when the Forest Service

initiated consultation, until May 11, 1994, when FWS issued its biological opinion, and from March 24, 1995, when FWS reinitiated consultation, until June 12, 1995, when FWS issued a revised final biological opinion. Therefore, the Government's motions for summary judgment as to damages alleged to arise from the C6.01 and the non-C6.01 contracts in Case Nos. 94–784C and 96–204C are granted for the periods of time in which the Forest Service was in consultation with FWS.

## V. Activities Barred by Section 9 of the Endangered Species Act

■ The Government contends that Scott cannot maintain a claim for damages for periods of time when the Forest Service was not engaged in formal consultation with FWS.

FWS concluded in its May 11, 1994 biological opinion that harvesting could not go forward because of the presence and possible presence of marbled murrelet in various sale units. Def. Reply at 9. In its revised final biological opinion of June 12, 1995, FWS concluded that any sale areas occupied by murrelets could not be harvested and that any such harvesting would require that the contracts be terminated. *Id.*

The Government also argues that, beginning on September 28, 1992, when FWS listed the marbled murrelet as a threatened species, the Forest Service and Scott were both subject to section 9 of the ESA, 16 U.S.C. § 1538, which would have prohibited the harvesting of any timber in the sale area, regardless of whether the Forest Service was engaged in consultation with FWS. Def. Reply at 10–11. Section 9 of the ESA provides as follows:

§ 1538. Prohibited acts

(a) Generally.

(1) Except as provided in sections [1535(g)(2) and 1539 of this title], with respect to any endangered species of fish or wildlife listed pursuant to section [1533 of this title] it is unlawful for any person subject to the jurisdiction of the United States to—

(B) take any such species within the United States or the territorial sea of the United States;

16 U.S.C. § 1538(a). The Government urges that the harvesting of timber in areas occupied by marbled murrelets would constitute a prohibited "taking." *Marbled Murrelet (Brachyramphus Marmoratus) v. Pac. Lumber Co.*, 880 F.Supp. 1343 (N.D.Cal.1995) (enjoining timber harvesting upon the basis of a possible take of marbled murrelets by destruction of habitat).

Scott counters that section 9 of the ESA prohibits only the actual "take" of a listed species. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (holding that the Government cannot enforce a section 9 prohibition until an animal has actually been killed or injured). Pl. Surreply at 11.

The ESA defines "taking" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The implementing regulations further define the terms "harass" and "harm." "Harass ... means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The definition of harm, upheld by the Supreme Court, is "an act which actually kills or injures wildlife. Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Babbitt v. Sweet Home*, 515 U.S. at 696–700, 115 S.Ct. 2407.

*Ariz. Cattle Growers' Ass'n. v. United States Fish & Wildlife*, 273 F.3d 1229, 1237–38 (9th Cir.2001). Scott argues that if it had been permitted to harvest timber, its activities would have, at most, amounted to a mere degradation of the marbled murrelet's habitat, which does not constitute a take. Pl. Surreply at 11; Transcript of Proceedings at 98–100, *Scott Timber Inc. v. United States*, Case No. 94–784C (Fed.Cl. July 15, 2004). There is an issue of material fact as to whether any of Scott's activities would have included "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Babbitt v. Sweet Home*, 515 U.S. at 696–700, 115 S.Ct. 2407. The Government's motions for summary judgment as to damages alleged to arise from the C6.01 and non-C6.01 contracts in Case Nos. 94–784C and 96–204C, therefore, are denied as they pertain to periods of time when the Forest Service was not engaged in consultation with FWS under section 7 of the ESA.

## VI. Constructive Termination

The Government argues that the Forest Service should be held to have constructively terminated Scott's non-C6.01 contracts pursuant to Clause C8.2, in order to comply with the district court's order. *See* Berry Bushel Contract, Clause C8.2, Pl.App. at 110 ("[T]he Chief, Forest Service, by written notice, may terminate this contract, in whole or in part, (1) to comply with a court order ... or (2) upon a determination that the continuation of all or part of this contract would ... (d) jeopardize the continued existence of Federally listed threatened and endangered species or, cause unacceptable adverse impacts on sensitive species ...."). The Government reasons that because the Forest Service lacked contractual authority to suspend Scott's non-C6.01 contracts, *Scott IV*, 333 F.3d at 1368, the Forest Service would have had no option other than to terminate Scott's operations pursuant to Clause 8.2, in order to comply with 16 U.S.C. § 472a ("The Secretary shall not extend any contract period with an original term of two years or more unless he finds ... substantial overriding public interest justifies the extension.") and 36 C.F.R. § 223.115 ("The term of any contract or permit shall not be extended unless the approving officer finds ... [t]hat the substantial overriding public interest justifies the extension."). Def. Mot. for Summ. J. at 39.

The Government cites *College Point Boat Corp. v. United States*, 267 U.S. 12, 45 S.Ct. 199, 69 L.Ed. 490 (1925), which established

the basis for courts to hold that government contracts had been constructively terminated:

> A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact. He may, likewise, justify an asserted termination, rescission, or repudiation, of a contract by proving that there was, at the time, an adequate cause, although it did not become known to him until later.

*Id.* at 16, 45 S.Ct. 199 (applying, retroactively, the right to "modify, suspend [or] cancel" a contract that the Department of the Navy had with the plaintiff on the basis of authority granted by the Act of June 15, 1917, cl. 29, 40 Stat. 182).

Relying upon *College Point Boat*, the Government argues that the Court should assume that, had the Forest Service known at the time that it lacked the authority to suspend Scott's non-C6.01 timber sale contracts, it would have instead canceled those contracts. Def. Mot. for Summ. J. at 37 ("[T]his Court should hold that *College Point Boat* entitles the Government to retroactively rely upon Clause C8.2, when the Government here had believed that it had the contractual right and Scott's agreement to suspend Scott's operations."). The Government then goes further, urging the Court to hold that those contracts were constructively terminated pursuant to Clause C8.2. By doing so, the Court would limit the amount of damages to which Scott would be entitled for breach of the non-C6.01 contracts. Def. Mot. for Summ. J. at 35.

■ The Government is mistaken in its understanding of constructive termination. Constructive termination is applied when the Government attempts to terminate a contract, but fails to do so for a legally sufficient reason. If, at the time, the Government had a right to terminate, the Court will hold that the contract was constructively terminated— even if the Government was unaware of that right. A party who is sued for breach may "justify an *asserted termination* ... of a contract by proving that there was, at the time, an adequate cause, although it did not

become known to him until later." *College Point Boat,* 267 U.S. at 16, 45 S.Ct. 199 (emphasis added); *see also Reservation Ranch v. United States,* 39 Fed. Cl. 696, 719 (1997) ("It is settled law that where the government *has canceled a contract* based upon erroneous grounds, the cancellation *may be sustained* if there existed an adequate ground for cancellation at the time of cancellation, *even if the ground was not then known.*" (emphasis added)); *United States v. Amdahl Corp.,* 786 F.2d 387, 394 n. 7 (Fed. Cir.1986); *Pots Unlimited, Ltd. v. United States,* 220 Ct.Cl. 405, 410, 600 F.2d 790, 793 (Ct.Cl.1979); *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 325 F.2d 438, 443 (1963) ("The contracting officer on plaintiff's contract probably thought that he was *cancelling the agreement* for illegality. That excuse was not a valid justification as we now know, but just as in *College Point Boat Corp.,* a good ground did exist in the far-reaching right to terminate under the termination article." (emphasis added)).

■ In this case, the Forest Service did not cancel Scott's non-C.601 timber sale contracts. Instead, "the Government here had believed that it had the contractual right and Scott's agreement to suspend Scott's operations," Def. Mot. for Summ. J. at 37, and therefore it simply continued the suspension of Scott's timber sale contracts. Unlike the agencies in the constructive termination cases, the Forest Service did not breach the timber sale contracts by attempting to terminate them; the Forest Service breached the contracts by suspending them without authorization. What's more, unlike the agencies in the constructive termination cases which were unaware that they had authorization to terminate their contracts, the Forest Service was aware it had such a right under Clause C8.2 and chose not to exercise that right.

Therefore, the Government's request that the Forest Service be deemed to have constructively terminated Scott's non-C6.01 contracts pursuant to Clause C8.2 is denied.

### CONCLUSION

In consideration of the above, the Court GRANTS plaintiff's Motion for Summary

Judgment as to Liability on Counts II and III of the Amended Complaint in Case No. 96–204C. The Court also GRANTS defendant's Motions for Summary Judgment as to Damages in Case Nos. 94–784C and 96–204C for the periods of time during which the Forest Service was in consultation with the FWS pursuant to section 7(a)(2) of the ESA; the Court DENIES defendant's Motions for Summary Judgment as to damages for the periods of time during which the Forest Service was not in consultation with the FWS.

The Court ORDERS that the parties shall file a joint status report by **March 8, 2005.** The parties shall state, in light of this Opinion and Order, to what damages, if any, plaintiff may still be entitled for breach of the non-C6.01 contracts. The parties should assume, for purposes of their reports, that plaintiff could have harvested the timber sales without violating section 9 of the ESA. The parties shall also state to what damages, if any, plaintiff might be entitled if the suspensions of the C6.01 contracts were held to have been unreasonable in duration. Again, the parties should assume, for purposes of their reports, that plaintiff could have harvested the timber sales without violating section 9 of the ESA. The parties shall also propose a schedule of further proceedings in these consolidated cases in order to address the remaining issues to be resolved.

IT IS SO ORDERED.